IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re Enron Corporation Securities, Derivative & "ERISA" Litigation | § § § § | MDL-1446 |
| MARK NEWBY, ET AL., | § § | |
| Plaintiffs | § § | |
| VS. | § § | CIVIL ACTION NO. H-01-3624 CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | § § | |
| Defendants | § | |
| AMERICAN NATIONAL INSURANCE COMPANY, et al., | § § § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § § | CIVIL ACTION NO. G-03-0481 |
| ROYAL BANK OF CANADA, et al., | § § | |
| Defendants. | § | |

**OPINION AND ORDER**

Pending before the Court in the above referenced cause

are the RBC Defendants' (collectively, "RBC's")[1] motion to dismiss

(instrument #30) Plaintiffs'[2] Second Amended Complaint[3] pursuant

---

[1] The RBC Defendants are Royal Bank of Canada, Royal Bank Holdings, Inc., Royal Bank DS Holdings, Inc., RBC Dominion Securities, Limited, RBC Dominion Securities, Inc., RBC Holdings (USA), Inc., and RBC Dominion Securities Corporation.

[2] Plaintiffs are American National Insurance Company, American National Investment Accounts, Inc., SM&R Investments, Inc., American National Property and Casualty Company, Standard Life and Accident Insurance Company, Farm Family Life Insurance Company, Farm Family Casualty Insurance Company, and National Western Life Insurance Company.

[3] The Second Amended Complaint is instrument #26.

to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and RBC's motion to strike Plaintiffs' surreply[4] (# 36).

Plaintiffs allege that RBC conspired with and aided and abetted Enron in defrauding them and other investors by helping to devise and implement complex sham transactions (Alberta, LJM2, Hawaii Trusts, and Cerberus) whose only function was to help Enron hide millions of dollars of debt and overstate its income. Relying on Enron's false financial statements and the information about Enron created by Defendants and disseminated through various media outlets to investors, Plaintiffs purchased and continued to hold through Enron's collapse the following Enron securities: (1) American National Property and Casualty Company, American National Investment Accounts, Inc., SM&R Investments, Inc, and Standard Life and Accident Insurance Company purchased Enron common stock from 1997-2001; (2) Farm Family Casualty Insurance Company and Farm Family Life Insurance purchased Enron Capital, L.L.C. preferred shares in 1993; (3) Farm Family Life Insurance Company purchased an Enron bond in 1992; (4) American National Insurance Company purchased Enron commercial paper and an Enron bond in 2001; and (5) National Western Life Insurance Company purchased Enron bonds in 1992 and 1993.  They claim that they suffered substantial losses when Enron collapsed and filed for bankruptcy protection on December 2, 2001.

RBC's motion points out that the four causes of action asserted by Plaintiffs against RBC under Texas law and presents reasons why they should each be dismissed:  (1) aiding and

---

[4] Plaintiffs' surreply is #34.

abetting fraud by Enron under the Texas Securities Act, Texas Revised Civil Statute Annotated Article 581-33F(2)(West 2002)("TSA"), because Plaintiffs cannot state a viable claim of primary liability against Enron; (2) common law fraud because Plaintiffs have not alleged an actionable misrepresentation nor material non-disclosure by the RBC Defendants;(3) violation of Section 27.01 of the Texas Business and Commerce Code (West 2002) because Plaintiffs fail to allege that (a) the RBC Defendants had a duty to disclose Enron's alleged misrepresentations, (b) that RBC Defendants directly benefitted from any of Enron's alleged fraudulent misrepresentations, (c) that Plaintiffs actually and justifiably relied on any alleged misrepresentations in purchasing the securities at issue; and (4) civil conspiracy to commit fraud because Plaintiffs fail to adequately plead key elements, specifically a combination or agreement between RBC and Enron and actual and justifiable reliance by Plaintiffs on Enron's alleged misrepresentations in purchasing their Enron securities.

Furthermore, RBC contends that Plaintiffs' "holder" claims, based on the diminution in value of Enron securities they purchased in early 1990's and were induced to hold because of Enron's alleged misrepresentations, should be dismissed. In their response to the motion to dismiss, Plaintiffs state in a footnote that based on the Court's decision in *American National Ins. Co. v. J.P. Morgan Chase & Co.*, G-02-0299, instrument #66, in which this Court addressed and dismissed the holder claims as a matter of law, Plaintiffs will no longer be urging these claims against the RBC Defendants here. #32 at 5 n.1. In addition the Court

refers the parties to and incorporates here its earlier opinion and order, #75 in *American National Ins. Co., et al., v. Citigroup, Inc., et al.,* G-02-723, which further addresses the "holder"-claim issue as a matter of law.

Accordingly, the Court dismisses the holder claims based on Farm Family Casualty Insurance Company and Farm Family Life Insurance's purchases of Enron Capital, L.L.C. preferred shares in 1993; Farm Family Life Insurance Company purchase of an Enron bond in 1992; and National Western Life Insurance Company's purchase of Enron bonds in 1992 and 1993.

RBC points out that Plaintiffs have filed two amended complaints and have had ample opportunity to state a claim and therefore asks the Court to deny them leave to replead. RBC argues that the nature of the deficiencies here is legal and is not subject to cure and thus additional amendment would be futile.

The Court now examines the motion to dismiss the four causes of action.

## I.  Standards of Review

As stated in 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure Civ.3d* § 1204 at 104-05 (West 2004),

> The manner and details of pleading in the federal courts are governed by the Federal Rules of Civil Procedure regardless of the source of substantive law to be applied in the particular action. . . . It no longer can be doubted that the rules regarding the standard of specificity to be applied to federal pleadings, the pleadings allowed in the federal courts, the form of the pleadings, the special requirements for pleading certain matters, the allocation of the burden of pleading among the parties, and

> the signing of pleadings by an attorney of
> record or an unrepresented party, all are
> governed by the federal rules and not by the
> practice of the courts in the state in which
> the federal court happens to be sitting.

*See also In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 388
F. Supp.2d 780, 783-84 (S.D. Tex. 2005)(and cases cited therein).

**A.  Rule 9(b)**

Federal Rule of Civil Procedure 9(b) provides,

> In all averments of fraud or mistake, the
> circumstances constituting fraud or mistake
> shall be stated with particularity.  Malice,
> intent, knowledge, and other condition of
> mind of a person must be averred generally.

"In every case based upon fraud, Rule 9(b) requires the
plaintiff to allege as to each individual defendant 'the nature
of the fraud, some details, a brief sketch of how the fraudulent
scheme operated, when and where it occurred, and the
participants." *Hernandez v. Ciba-Geigy Corp. USA*, 200 F.R.D. 285,
291 (S.D. Tex. 2001).  In a securities fraud suit, the plaintiff
must plead with particularity the circumstances constituting the
alleged fraud:  Rule 9(b) requires the plaintiff to "'specify the
statements contended to be fraudulent, identify the speaker, state
when and where the statements were made, and explain why the
statements were fraudulent.'" *Southland Securities Corp. v.
INspire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004),
*quoting Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177-78
(5th Cir. 1997), *cert. denied*, 522 U.S. 966 (1997).  "'In cases
concerning fraudulent misrepresentation and omission of facts,
Rule 9(b) typically requires the claimant to plead the type of
facts omitted, the place in which the omissions should have

appeared, and the way in which the omitted facts made the representations misleading.'" *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006), *quoting United States ex. rel. Riley v. St. Luke's Hosp.*, 355 F.3d 370, 381 (5th Cir. 2004).

Although Rule 9(b) allows a plaintiff to plead intent to deceive or defraud generally, a mere conclusory statement that the defendant had the required intent is insufficient; the plaintiff must set forth specific facts that raise an inference of fraudulent intent, for example, facts that show the defendant's motive. *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994); *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994). Intent to deceive or defraud usually must be proved by circumstantial evidence, but to establish a material fact, that evidence "'must transcend mere suspicion.'" *IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113, 124 (Tex. App.--Houston [14[th] Dist.] 2003, pet. denied). Although a party's intent to defraud is determined at the time the party made the misrepresentation, "it may be inferred from the party's subsequent acts after the representation is made." *Id.; see also Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 431, 434 (Tex. 1986). The court should not view each piece of circumstantial evidence separately, but should weigh the evidence as a whole. *IKON*, 125 S.W.3d at 124. "Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d at 434.

"[Wh]en agency is an element of a fraud claim, agency must be pleaded with particularity required under Rule 9(b)." *Whitney National Bank v. Medical Plaza Surgical Center, L.L.P.*, No. H-06-1492, 2007 WL 400094, *3 (S.D. Tex. 2007), *citing Kolbeck v. LIT America, Inc.*, 923 F. Supp. 557, 570 (S.D.N.Y. 1996), *aff'd*, 152 F.3d 918 (2d Cir. 1998); *American Credit Union v. HCG Financial Servs., Inc.*, No. 89 C 9583, 1990 WL 77992, *4 (N.D. Ill. June 1, 1990); *Chou v. University of Chicago*, 254 F.3d 1347, 1362 (Fed. Cir. 2001); *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 916 (8th Cir. 2001); and *Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 783 (7th Cir. 1999).[5]

The particularity requirement of Rule 9(b) also governs a conspiracy to commit fraud. *Southwest Louisiana Healthcare System v. MBIA Ins. Corp.*, No. 05-1299, 2006 WL 1228903, *5 & n.47 (W.D. La. May 6, 2006); *Hernandez v. Ciba-Geigy Corp. USA*, No. Civ. A. B-00-82, 2000 WL 33187524, *4 (S.D. Tex. Oct. 17, 2000)("The weight of Fifth Circuit precedent holds that a civil conspiracy to commit a tort that sounds in fraud must be pleaded with particularity."); *In re Ford Motor Co. Vehicle Paint Litigation*, No. MDL 1063, 1994 WL 426548, *34 (E.D. La. July 30, 1996); and *Castillo v. First City Bancorporation of Texas, Inc.*, 43 F.3d 953, 961 (5th Cir. 1994).

---

[5] In *Lachmund* the Seventh Circuit held that "when the plaintiff relies upon the same circumstances to establish both the alleged fraud and the agency relationship of a defendant, the reasons for more particularized pleading that animate Rule 9(b) apply with equal force to the issue of agency and to the underlying fraud claim." 191 F.3d at 783.

The Fifth Circuit, although construing Rule 9(b) strictly, has recognized an exception and permits the requirements to be "relaxed" where facts relating to the fraud are "peculiarly within the perpetrator's knowledge"; then the alleged fraud "may be pled on information and belief, provided the plaintiff sets forth the factual basis for his belief." *United States ex rel. Russell v. EPIC Healthcare Management Group*, 193 F.3d 304, 308 (5th Cir. 1999), *citing United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)(warning that the exception "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations."). The relaxed standard is not applicable where the information is available from another source or where the plaintiff fails to allege a factual basis for his beliefs. *Sealed Appellant I v. Sealed Appellee I*, 156 Fed. Appx. 630, 634 (5th Cir. 2005)(plaintiff must allege sufficient factual basis for his belief defendant committed fraud, e.g., particular documents containing false statements, identified by number, date or otherwise, or explain how he tried, but failed to obtain the information, whom he contacted, etc.).

A dismissal for failure to plead with particularity in accordance with Rule 9(b) is treated as a Rule 12(b)(6) dismissal for failure to state a claim. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996). If it appears that given an opportunity to amend the pleading, the plaintiff would be able to state a claim upon which relief could be granted, the court should grant leave to amend. *People's Choice Home Loan, Inc. v. Mora*, No. 3:06-CV-1709-G, 2007 WL 708872, *4 (N.D. Tex. Mar. 7,

2007), *citing Kennard v. Indianapolis Life Ins. Co.*, 420 F. Supp.2d 601, 608-09 (N.D. Tex. 2006).

## B.  Rule 12(b)(6)

Dismissal under Rule 12(b)(6) is disfavored and a motion to dismiss under the rule is rarely granted. *Lowrey v. Texas A&M University System*, 117 F.3d 242, 247 (5th Cir. 1997). The court must construe the complaint liberally in favor of the plaintiff and all well pleaded facts must be taken as true and any doubts regarding the sufficiency of the claim must be resolved in favor of the plaintiff. *Id.; Jones v. Alcoa, Inc.*, 339 F.3d 359, 362 (5th Cir. 2003). Nevertheless conclusory allegations and unwarranted factual deductions will not suffice to avoid a motion to dismiss. *United States ex rel. Willard v. Humana Health Plan of Texas, Inc.*, 336 F.3d 375, 379 (5th Cir. 2003).

Traditionally, dismissal was not proper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Lowrey,* 117 F.3d at 247, *citing Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In a recent antitrust case, *Bell Atlantic Corporation v. Twombley*, 127 S. Ct. 1955 (2007)(7-2), however, the Supreme Court appears to have modified the *Conley* rule by inserting a new "plausibility standard," when it pronounced that the "'no set of facts' language" test "has earned its retirement" and "is best forgotten." *Bell Atlantic*, 127 S. Ct. at 1969, opined that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions and a formulaic recitation of the elements of a cause

of action will not do . . . ." 127 S. Ct. at 1964-65. "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* at 1965, *citing* 5 C. Wight & A. Miller, *Federal Practice and Procedure* § 1216, at 235-36 (3d ed. 2004). The Federal Rules "have not dispensed with the pleading of facts altogether," but "for most types of cases . . . [have] eliminated the cumbersome requirement that a claimant 'set out *in detail* the facts upon which he bases his claim.'" *Id.* at 1265 n.3, *citing Conley*, 355 U.S. at 47. Nevertheless "some factual allegation" is necessary to "satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." *Id.*, *citing* 5 Wright & Miller § 1202 at 94, 95("Rule 8(a) 'contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented' and does not authorize a pleader's 'bare averment that he wants relief and is entitled to it"). In reviewing *Conley*, the Supreme Court concluded,

> [O]nce a claim has been stated adequately, it may be supported by any set of facts consistent with the allegations in the complaint. *Conley*, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival.

127 S. Ct. at 1969. Because Rule 9(b)'s heightened pleading standard applies to the fraud-based claims alleged here, the Court will not analyze *Bell Atlantic* further.


## II.   Applicable Substantive Law

**A. TSA**[6]

1.  Primary Liability

A prerequisite for establishing secondary liability for aiding and abetting under the TSA is a primary violation under the statute. *Sterling Trust Co. v. Adderley*, 168 S.W.3d 835, 845 (Tex. 2005)("a secondary violator's liability depends upon the primary violator's culpability").  Plaintiffs assert that Enron was a primary violator under the TSA under two provisions, articles 581-33A(2) and 581-33C.

Under Article 581-33A(2), a primary violator is a person who "offers or sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading." Art. 581-33A(2).  Under the TSA a statutory "seller" is the person who sold the security directly to the purchaser or who acted as the vendor's agent and solicited the sale.  *In re Enron Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 601-08 (S.D. Tex. 2003)(requiring privity between the primary-violator "seller" and plaintiff).  Either Plaintiffs must plead facts showing that Enron sold the securities directly to Plaintiffs or must plead facts demonstrating that Lehman Brothers acted as a broker or agent of

---

[6]  In the course of the Enron litigation, this Court has written extensively on the TSA.  It refers the parties in particular to *In re Enron Securities, Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 601-08 (S.D. Tex. 2003), and two opinions in a related action, *American National Ins. Co., et al., v. Citigroup, et al.*, G-02-723, instruments #75 and 76.  It incorporates the legal conclusions of those documents in the instant opinion and order, but with some modification in response to new arguments relating to articles 581-33C and 581-5H of the TSA.

Enron.  If Plaintiffs pursue their agency theory, they must plead

facts, and ultimately produce evidence, showing that there exists,

or there is a genuine issue of material fact for trial about, an

Enron-RBC   agency   relationship   that   satisfies   Texas   law

requirements.  *Id.;* #76 at 20-21, 34-36 in G-02-723.[7]

     "Under Texas law, agency is a mixed question of law and

fact."  *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1295-96 (5th

Cir. 1995).  Nevertheless, if the evidence is undisputed, whether

an agency relationship exists is a question of law for the court.

*Coffey v, Fort Wayne Pools, Inc.*, 24 F. Supp. 2d 671, 677 (N.D.

Tex. 1998), *citing Campbell v. Hamilton*, 632 S.W.2d 633, 634 (Tex.

App.–Dallas 1982, writ ref'd n.r.e.).  The party who asserts the

existence of agency relationship has the burden of proving it."

*Karl Rove*, 39 F.3d at 1296.

     Under Texas law,

> Agency is a legal relationship created by an
> express or implied agreement or by operation
> of law whereby the agent is authorized to act
> for the principal, subject to the principal's
> control.   As  in  the  formation  of  any
> contract,  the  consent  of  both  parties  is
> necessary    to    establish    an    agency
> relationship.  Agency is never presumed; it
> must be shown affirmatively. . . .  To prove
> an agency relation under Texas law, there
> must be evidence from which the court could
> conclude that "[t]he alleged principal [had]
> the right to control both the means and the
> details of the process by which the alleged

---

     [7] The Court notes that the evidence referenced in Plaintiffs'
opposition for the alleged agency theory between issuer Enron and
seller Lehman Brothers appears to be the same as that in G-02-723.
#32 at n.5.   The Court has held that as a matter of law the
"evidence" presented by Plaintiffs in G-02-723 in response to a
motion for partial summary judgment was insufficient to sustain the
agency claim.

agent   [was]   to   accomplish   the   risk.
[citations omitted]"

*Karl Rove*, 39 F.3d at 1296.    "Under Texas agency law, the
essential element is the 'right of control' of the purported agent
by the purported principal."   *United States v.   Contemporary
Health Management*, 807 F. Supp. 47, 49 (E.D. Tex. 1992), *cited for
that proposition in Karl Rove*, 39 F.3d at 1296 n.111.   *See also
In re Carolin Paxson Advertising, Inc.*, 938 F.2d 595, 598 (5th Cir.
1991)("The alleged principal must have the right to control both
the means and the details of the process by which the alleged
agent is to accomplish his task."), *quoted by Karl Rove*, 39 F.3d
at 1296.    "Absent proof of the right to control, only an
independent contractor relationship is established."    *In re
Carolin Paxson Advertising, Inc.*, 938 F.2d at 598.

In addition Plaintiffs newly and alternatively assert
that Enron, as a statutory issuer of the stocks and bonds they
have purchased,[8] is a primary violator under Article 581-33C of
the TSA.   Article 581-33C[9] of the TSA imposes primary liability on

---

[8] The governing Second Amended Complaint (#26), at ¶ 31,
states, "Publicly traded on the New York Stock Exchange under the
symbol ENE, Enron was an 'issuer' of securities for the purpose of
applying Texas securities laws."   It also alleges at ¶ 151 that RBC
"materially aided Enron, a seller and issuer of a security liable
as a primary violator under Article 581-33A."

[9] Section 33C, a strict liability statute, provides,

(C) Liability of Nonselling Issuers Which
Register.

(1) This Section 33C applies only to an issuer
which registers under Section 7A, 7B, or 7C of
this Act, or under Section 6 of the U.S.
Securities Act of 1933, its outstanding
securities for offer and sale by or for the
owner of the securities.

(2) If the prospectus required in connection with the registration contains, as of its effective date, an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, the issuer is liable to a person buying the registered security who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the securities. However, an issuer is not liable if it sustains the burden of proof that the buyer knew of the untruth or omission.

In a law review article on which this Court relied in its March 12, 2003 opinion, Hal Bateman, *Securities Litigation: The 1977 Modernization of Section 33 of the Texas Securities Act*, 15 Houston L. Rev. 847, 849 (1978), Bateman summarizes,

Section 33C applies only to issuers which register outstanding securities for sale by owners under either section 7 of the Texas Securities Act or section 6 of the Securities Act of 1933. This means that section 33C will apply only to registered secondary offerings by persons other than the issuer and will not apply in primary offerings by the issuer itself, although the liability created is a special liability of the issuer. With respect to registered secondary offerings, section 33C provides that the issuer of the security is liable to any person who buys the registered security if, as of the effective date, the prospectus required in connection with the registration contains a material misstatement of fact or fails to state any material fact necessary to make what is stated not misleading. Liability clearly will extend to any buyer of the registered security and no privity limitation or requirement is included. Nor is it necessary for the plaintiff to prove reliance on the misstatement or omission in the prospectus. The sole basis of liability of the issuer under section 33C is material misstatement or omission in the prospectus, and the only defense available under section 33C is proof that the plaintiff actually knew of the untruth or omission. [footnotes omitted] Thus there is no privity nor reliance requirement to impose liability on an issuer; liability is based solely on a material

issuers of registered securities purchased on a secondary market for misleading statements in the prospectus under which those securities were issued.  Plaintiffs assert that they purchased the Enron common stock and the bond, which were registered securities, on the secondary market, specifically the New York Stock Exchange.

2.   Secondary Liability

Article 581-33F(2) provides for secondary liability of aiders and abettors:

> A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer or issuer.

A claim for secondary liability for another party's primary violations of the TSA art. 581-33(F)(2) may be based on either (1) control person liability ("[a] person who directly or indirectly controls a seller, buyer, or issuer of a security") or on (2) aider and abettor liability (permitting suit against one "who directly or indirectly with intent to deceive or defraud or with a reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security.").  Plaintiffs' claims against RBC fall into the second category.  An aider and abettor is jointly and severally liable with the primary violator "to the same extent as if he were" the primary violator.  Art. 581-33F(2).

---

misrepresentation or omission in the prospectus and a defendant's only defense is that plaintiff actually knew about the falsity or omission.

To establish secondary liability for aiding and abetting under the TSA, a plaintiff must prove (1) that a primary violation of the securities laws occurred; (2) that the alleged aider and abettor had a "general awareness" of its role in this violation; (3) that the aider and abettor rendered "substantial assistance" in this violation; and (4) that the aider and abettor either intended to deceive plaintiff or acted with reckless disregard of the truth of the representations made by the primary violator. *Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380, 384 (Tex. App.--Houston [14th Dist.] 2000, pet. denied); *Goldstein v. Mortenson*, 113 S.W.3d 769, 776 (Tex. App.--Austin 2003). *See also Sterling Trust Co. v. Adderley*, 168 S.W.3d 835, 842 (Tex. 2005)(holding that as the statute's scienter requirement for aiding and abetting, "the TSA's 'reckless disregard for the truth or the law' standard means that an alleged aider can only be held liable if it rendered assistance 'in the face of a perceived risk' that its assistance would facilitate untruthful or illegal activity by the primary violator. . . . In order to perceive such a risk, the alleged aider must possess a ''general awareness that his role was part of an overall activity that was improper.''").[10] Furthermore,

---

[10] The Texas Supreme Court explained that "policy concerns favor[ed] a subjective standard" over a lesser negligence 'should have known' standard for aiders and abettors because

> [i]n most cases, the alleged aider and abettor . . . will merely be engaging in customary business activities, such as loaning money, managing a corporation, preparing financial statements, distributing press releases, completing brokerage transactions, or giving legal advice. If each of these parties will be required to investigate the ultimate activities of the party whom he is assisting,

"the TSA does not require the aider to have had direct dealing with the defrauded party; indeed a person who 'materially aids a seller' may have no contact at all with the investors." *Sterling Trust*, 168 S.W.3d at 843.   The TSA also does not require an investor to prove he relied on the alleged misrepresentations or omissions.  *In re Westcap Enterprises*, 230 F.3d 717, 726 (5th Cir. 2000).

## B.   Common law Fraud

To prevail on a cause of action for common law fraud under Texas law, a plaintiff must prove that the defendant (1) made a misstatement or omission (2) of material fact (3) with the intent to defraud (4) on which the plaintiff relied, and (5) which proximately caused the plaintiff injury.  *Hernandez v. Ciba-Geigy Corp. USA*, 200 F.R.D. 285, 291 (S.D. Tex. 2002), *citing Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir. 1997).  The elements of a fraud are a material misrepresentation, which was false and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon and which caused injury."). "[A] defendant who acts with knowledge that a result will follow

---

a burden may be imposed upon business activities that is too great. . . The essential point is that imposition of a duty to investigate under the guise of a "should have known" standard in essence would amount to eliminating scienter as a necessary element in imposing aiding and abetting liability and the substitution of a negligence standard.

*Sterling Trust*, 168 S.W.3d at 842, *quoting* Ruder, *Multiple Defendants in Securities Law Fraud Cases:  Aiding and Abetting Conspiracy*, In Pari Delicto, *Indemnification, and Contribution*, 120 U. PA. L. Rev. 597, 632-22 (1972).

is considered to intend the result." *Ernst & Young, L.L.P. v. Pacific Mutual Life Ins. Co.*, 51 S.W.3d 573, 578-80 (Tex. 2001)(concluding that Texas jurisprudence is consistent with the standard of the *Restatement (Second) of Torts* § 531 (1977) that the fraudfeasor intend or have "reason to expect" that the third party will act in reliance on the misrepresentation).

The Texas Supreme Court has recognized a cause of action for common law fraud when

> (a) a party conceals or fails to disclose a material fact within the knowledge of that party,
> (b) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,
> (c) the party intends to induce the other party to take some action by concealing or failing to disclose the fact, and
> (d) the other party suffers injury as a result of acting without knowledge of the disclosed fact.

*Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001). "Fraudulent concealment or non-disclosure is a subcategory of fraud that occurs when a party with a duty to disclose a material fact fails to disclose that fact." *GMAC Commercial Mortgage Corp. v. East Texas Holdings, Inc.*, 441 F. Supp.2d 801, 807 (E.D. Tex. 2006), *citing Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997)("Reliance is an element of fraud. Fraud by non-disclosure is simply a subcategory of fraud because where a party has a duty to disclose, the non-disclosure may be as misleading as a positive misrepresentation of facts [citations omitted]."), and *Bradford*, 48 S.W.3d at 754-55.

As indicated, for a claim of fraud based on non-disclosure, the defendant must have a duty to disclose. When

particular circumstances impose on a person a duty to speak, silence can constitute a false representation. *World Help v. Leisure Lifestyles, Inc.*, 977 S.W.2d 662, 670 (Tex. App.--Fort Worth 1998, pet. denied). An affirmative duty to disclose may arise in four circumstances: (1) where there is a fiduciary or confidential relationship between the parties; (2) where a person voluntarily discloses information, he must disclose the whole truth; (3) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (4) when a person makes a partial disclosure and conveys a false impression. *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App.--Houston [14[th] Dist.] 1997, pet. denied); *Id. See also Union Pacific Resources Group, Inc. v. Rhone-Poulenc,* Inc., 247 F.3d 574, 586 (5th Cir. 2001); *GMAC Commercial*, 441 F. Supp.2d at 808. A plaintiff must allege facts showing that a defendant had such a duty to disclose under Rule 9(b). *Carroll*, 470 F.3d at 1174.

Relying on, but not formally adopting, the *Restatement (Second) of Torts* § 531 (1977),[11] the Texas Supreme Court has also recognized a common law fraud cause of action where the false representation was made with the intent of reaching and deceiving a third person and thereby causing that third party injury; privity is not required between the fraudfeasor and the person he is trying to influence. *Ernst & Young*, 51 S.W.3d at 580. Section

---

[11] The Texas Supreme Court found that "section 531's reason-to-expect standard comports with our jurisprudence and does not expand the parameters of common law fraud in Texas. . . ." 51 S.W. 3d at 580.

531 requires more than probability of reliance and more than an obvious risk that a misrepresentation might be repeated to the third party; the fraudfeasor must "have information that would lead a reasonable man to conclude there is *an especial likelihood* that it will reach those persons *and will influence their conduct.*" *Ernst & Young*, 51 S.W.3d at 581, *citing* § 531 cmt. d (1977). *See also IQ Holdings, Inc. v. Arthur Andersen, LLP (In re Worldcom, Inc. Securities Litig.*), No. 02 Civ. 3288 (DLC), 2006 WL 1047130 (S.D.N.Y. Apr. 21, 2006)(under Texas common law fraud where a misrepresentation was intended to reach a third person and induce reliance, plaintiff's reliance on defendant's statement must have been "especially likely"). Section 531 also has a "similar transaction requirement": "[t]he plaintiff must have incurred pecuniary loss 'in the type of transaction in which [the maker of the representation] intends or has reason to expect [his or her] conduct to be influenced.' . . . Though the transaction sued upon need not be identical to that the defendant contemplates, it must have the same essential character. . . ." *Ernst & Young* 51 S.W. 3d at 580.

Reliance is an element of common law fraud, regardless of whether the fraud is by affirmative misrepresentation or by nondisclosure. *Celanese Corp. v. Coastal Water Authority*, 475 F. Supp.2d 623, ____, 2007 WL 471160, *9 (S.D. Tex. Feb. 9, 2007)(applying Texas law). Because one must often determine whether particular circumstances impose a duty to disclose information where the claim is based on a failure to disclose and whether plaintiffs justifiably relied on a misrepresentation or

nondisclosure, "[r]eliance is ordinarily a question of fact for the fact-finder" and "is not a proper matter for dismissal on the pleadings." *Id., citing Jones v. Ray Ins. Agency*, 59 S.W.3d 739, 754 (Tex. App.--Corpus Christi 2001, pet. denied, 92 S.W.3d 530 (Tex. 2002)), and *1001 McKinney Ltd. v. Credit Suisse First Boston Mortgage Capital*, 192 S.W.3d 20, 30 (Tex. App.--Houston [14th Dist.], 2005, pet. denied)("In the context of common law fraud, courts have uniformly treated the issue of justifiable reliance as a question for the factfinder. . . . The question of justifiable reliance depends heavily on the relationship between the parties and their relative sophistication.").

## C. Section 27.01 of the Texas Business and Commerce Code

For a primary violation of the statute the elements of a claim of "[f]raud in a transaction involving . . . stock in a corporation" under the Texas Business and Commerce Code § 27.01(a)(1)(2002) in relevant part are:

> (1) false misrepresentation of a past or existing material fact . . .
> (A) made to a person for the purpose of inducing that person to enter into a contract; and
> (B) relied on by that person in entering that contract.

Because the statute is derived from common law fraud, Plaintiffs must show that they actually and justifiably relied upon Enron's allegedly fraudulent misrepresentations. *Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1025 & n.4 (5th Cir. 1990), *abrogated on other grounds, Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995).

The burden to show "justifiable" reliance under § 27.01 is lighter than that for "reasonable reliance." *Id.* at 1025. "To determine justifiability, courts inquire whether--given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud--it is extremely unlikely that there is actual reliance on the plaintiff's part." *Id.* at 1026.

Common law fraud is very similar to Section 27.01 except that the statutory cause of action does not require proof of a defendant's knowledge or recklessness in order to recover actual damages.[12] *Diversified, Inc. v. Walker*, 702 S.W.2d 717, 723 (Tex. App.--Houston [1st Dist. 1985, writ ref'd n.r.e.)("Sec. 27.01 is generally less demanding than common law fraud, imposing liability upon the maker of a misrepresentation without proof that he intended to deceive or knowledge that the representation was false."); *Robbins v. Capozzi*, 100 S.W.3d 18, 26 (Tex. App.--Tyler 2002, no pet.)("A cause of action for statutory fraud differs from the common law cause of action only in that it does not require proof that the false representation was made knowingly or recklessly," but it must be made with the intent to induce the claimant into entering the transaction), *citing Larsen v. Carlene Langford & Assoc., Inc.*, 41 S.W.3d 245, 248 (Tex. App.--Waco, 2001, pet. denied); *Fletcher v. Edwards*, 26 S.W.3d 66, 77 (Tex. App.--Waco 2000, pet. denied; *Brush v. Reata Oil and Gas Corp.*,

---

[12] Where Plaintiff prevails in claim against a primary violator under § 27.01(a) and proves the defendant did have knowledge, Plaintiff can recover exemplary damages under § 27.01(c).

984 S.W.2d 720, 726 (Tex. App.--Waco 1998, pet. denied)(and cases cited therein).

Section § 27.01(d) also provides liability for aiding and abetting a primary violator:

> A person who (1) has actual awareness of the falsity of a representation . . . made by another person and (2) fails to disclose the falsity of the representation . . . to the person defrauded, and (3) benefits from the false representation or promise commits the fraud described in Subsection (a) of this section and is liable to the person defrauded for exemplary damages.  Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

Two appellate courts have concluded that the Texas Supreme Court's definition of "actual awareness" in a DTPA case[13] "'would be similar, if not identical'" to that for section 27.01 of the Texas Business & Commerce clause:

> actual awareness 'does not mean merely that a person knows what he is doing; rather, it means that a person knows what he is doing is false, deceptive, or unfair.  In other words, a person must think to himself at some point, "Yes, I know this is false, deceptive, or unfair to him, but I'm going to do it anyway.'"

*Woodlands Land Development Co. v. Jenkins*, 48 S.W.3d 415, 426 (Tex. App.--Beaumont 2001), and *Scott v. Sebree*, 986 S.W.2d 364, 371 (Tex. App.--Austin 1999, pet. denied).

According to one court, Section 27.01(d) "applies to those who have benefitted in the specific sale of real estate or stock in which the fraud occurred, for instance a company who

---

[13] *St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.*, 973 S.W.2d 51, 53-54 (Tex. 1998).

receives fees in a real estate closing." *IQ Holdings* (*In re WorldCom Sec. Litig.*), 2006 WL 1047130 at *6,[14] *citing Belton v. Dover Properties Sales, Inc.*, Civ. A. No. 3-85-0557-H, 1985 WL 8797, *3 (N.D. Tex. 1985)("The "benefit from the false representations" obtained by the aider and abettor may include "customary fees of the closing itself" since the "fees would not have been received if the desired disclosure was made.").

**D. Conspiracy to Defraud**

The elements of a cause of action for civil conspiracy in Texas are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Juhl v. Airington*, 936 W.W.2d 640, 644 (Tex. 1990). The "meeting of the minds" element is "to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Transport Insurance Co. v. Faircloth*, 898 S.W.2d 269, 278 (Tex. 1995). "[T]here must be a preconceived plan and unity of design and purpose." *Goldstein v. Mortenson*, 113 S.W.3d 769, 779 (Tex. App.--Austin 2003)(A conspiracy to defraud

---

[14] This Court observes that there was no analysis by the *IQ Holdings* court, but merely the minimal, conclusory statement, "IQ Holdings does not allege, or suggest in its opposition papers that it could allege, that any defendant benefitted from either of the two transactions in which it purchased WorldCom stock." *Id.* This Court finds that sentence insufficient to constitute even nonbinding precedent on defining "benefit" under the statute. *Belton* provides only a single example in naming customary fees. Neither mandates that a "benefit" be monetary. The language of the statute ("benefits from the false representation or promise") does not limit the benefit to the end result, i.e., the closing or sale, as opposed to the whole transaction. *Belton*, unlike *IQ Holdings*, does not state that the benefit be derived from the closing or sale of the stock.

on the part of two or more persons means a common purpose, supported by a concerted action to defraud, that each has the understanding that the other has that purpose."). "Once a conspiracy is proven, each co-conspirator 'is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination.'" *Carroll v. Timmers Chevrolet*, 592 S.W. 2d 922, 926 (Tex. 1979)(*quoting State v. Standard Oil Co.*, 130 Tex. 313, 329, 107 S.W. 2d 550, 559 (1937)).

The "gist" of a civil conspiracy" is the injury the conspirators intend to cause.  Conspiracy is a derivative tort, because recovery is not based on the conspiracy, i.e., the agreement, but on the injury from the underlying tort, here allegedly fraud.  *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).  Thus to be liable for conspiracy, a defendant must also participate in the underlying fraud.  *Id*.  Furthermore, if a plaintiff cannot adequately allege with particularity or ultimately prove an element of the underlying fraud, the conspiracy claim also fails.  *Hernandez v. Ciba-Geigy Corporation USA*, 200 F.R.D. 285, 292 (S.D. Tex. 2001); *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 380 (5th Cir. 2004).  Under Rule 9(b), conspiracy to commit fraud must be pleaded with particularity as to time, place, and contents of false representations and the identity of the person making them and what he obtained thereby.  *Castillo v. First City Bancorporation of Texas, Inc.*, 43 F.3d 953, 961 (5th Cir. 1994).

Typically a conspiracy is proved by circumstantial evidence.  *Schlumberger*, 435 S.W.2d at 858, *citing Jernigan v.*

*Wainer*, 12 Tex. 189 (1854).  "Circumstantial evidence may be used to establish any material fact, but it must constitute more than mere suspicion." *Transport*, 898 S.W.2d at 278*, citing Browning - Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927-28 (Tex. 1993)("some suspicion linked to other suspicion produces only more suspicion, which is not the same as evidence."); *Schlumberger*, 435 S.W.2d at 858 ("vital facts may not be proved by unreasonable inferences from other facts and circumstances"; any vital fact must be proved "by evidence amounting to something more than a mere scintilla"). Where the circumstantial evidence is meager, "if 'circumstances are consistent with either of two facts and nothing shows that one is more probable than the other, neither fact can be inferred.'" *Transport Ins.*, 898 S.W.2d at 278, *quoting $56,700 in U.S. Currency v. State*, 730 S.W.2d 659, 662 (Tex. 1987). Circumstantial evidence can include acts by or statements of the alleged conspirators.  *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581-82 (Tex. 1963)("The general rule is that conspiracy liability is sufficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators.").

### III.  Factual Allegations Against RBC

The Second Amended Complaint (#26) asserts that as Enron's financial problems increased, it implemented a giant Ponzi scheme.  To convince investors to lend money, it would "cook" its books to present a false picture of its financial stability.  In

November and December of 2001, when Enron filed for bankruptcy protection, and afterwards through the investigations by the Department of Justice, the  Securities and Exchange Commission, bankruptcy examiners Neal Batson and Harrison J. Goldin, several Congressional committees, and investor lawsuits, the fraud was gradually revealed, according to Plaintiffs.

The Second Amended Complaint further alleges that sworn statements (including settlements, cooperation agreements, and plea agreements) of ex-Enron officials, such as Chief Accounting Officer Richard Causey, Chief Financial Officer Andrew Fastow, Treasurer Ben Glisan, Mark Koenig, Kevin P. Hannon, Assistant Treasurer Timothy Despain, and Michael Kopper, some containing judicial admissions, "unequivocally establish Enron's scheme to defraud the investing public."[15]  #26 at ¶¶ 39-53.

The pleadings further charge that RBC materially assisted Enron in perpetrating its fraud through multiple transactions that involved off-balance sheet debt and that were impermissibly guaranteed by Enron, the proceeds of which were treated as operating income on Enron's financial statements.  RBC also structured transactions designed to hide Enron's debt and to materially alter its financial statements in violation of civil and criminal statutes.  According to the Second Amended Complaint, RBC participated in a number of multi-million dollar transactions that concealed Enron's liabilities and that were designed to allow Enron to falsely report positive financial results in SEC filings and misstate Enron's financial condition in various other

---

[15] The complaint quotes from a number of these.

financial reports.    #26 at ¶ 55.    RBC participated in using partnerships or special purpose entities ("SPEs"), which did not qualify for "off the books" accounting treatment, for the same purposes.  *Id.* at ¶ 56.    RBC structured transactions to enable Enron to report loan proceeds as "cash flow from Operations" so it could inflate its financial condition in reports and filings. *Id.* at ¶ 57.

The complaint focuses specifically on four transactions in which Enron allegedly was aided by RBC and which were used by Enron to manipulate its financial statements:  Alberta Prepay, Cerberus, Hawaii, and LJM2.

In the Alberta transaction (#26 at ¶¶ 59-72), which began in August 2000, in return for a substantial fee from Enron, RBC's newly acquired Global Structured Finance Group in London allegedly financed a loan disguised as a prepay agreement that went through three different structures before Enron finally approved the last for fraudulent "off-balance-sheet" accounting treatment.[16]    The third and final proposal, outlined in RBC's "Transaction Request–Global Banking," dated September 27, 2000, "involved four swaps providing two circular streams of payment among RBC and Chase, all guaranteed by Enron,[17] with RBC funding 50% of the total purchase price."    #26 at ¶ 62.    The complaint

---

[16] According to the complaint at ¶ 59, Enron Canada won the bidding on a series of 20-year Power Purchase Agreements ("PPA's"), and Enron wanted to structure a deal to disguise the financing loan to Alberta as a commercial transaction.

[17] The complaint notes that the off-balance-sheet accounting was "improper because Enron was the ultimate guarantor of the loans and thus, could not legitimately remove this debt from its balance sheet."  #26 at ¶ 67.

quotes documents and statements by named officials involved in the transaction, evidencing that RBC and Enron knowingly intended to bypass US GAAP requirements and apply off-balance-sheet treatment to a "prepay" commercial transaction that was actually nothing more than a loan to Enron.[18]     The final Alberta

_____

[18] The complaint quotes several sources to demonstrate that RBC knew that the accounting for Alberta was misleading and fraudulent. In RBC's August 30, 2000 Risk Assessment Framework ("RAF") on Enron in connection with Alberta, the transaction is described (quoted in in ¶ 64 of the complaint) as follows:

> The structure of this transaction converts a loan to finance the purchase of a PPA into a gas purchase agreement with Enron Canada; permits off balance sheet treatment under US GAAP . . .

According to ¶ 65, an RBC financial analyst, Blair Fleming, on September 26, 2000 sent an email to Graeme Hepworth to explain why the transaction could not have any of the covenants usual and customary in loan transactions:

> However, we cannot in the documentation state this linkage [sic] or we run afoul of the auditors.   Ergo we each have voluntary termination rights under our Swaps. Basically, Enron is trusting us not to terminate early and obviously that would be a significant relationship call if we would.

In its final Alberta transaction request of September 27, 2000, quoted in ¶ 66 of the complaint, RBC structured the transaction to accommodate Enron's goals:

> To fulfill Enrons' [sic] auditors [sic] requirements in the treatment of the Swap 1 as "non-debt",[sic] at maturity or upon acceleration, RBC cannot be relieved of its payment obligations under Swap 2.

In addition, the "Covenant Evaluation" section of the request, *id.*, explains,

> The contract has to maintain its commercial nature and therefore will not contain covenants or any events of default that would be unique to financing arrangements.

transaction request required that the risk associated with the

Alberta transaction was "all guaranteed by Enron Corp."[19]   Its

---

Finally, in ¶ 66, under a section titled "Prepaid Gas Purchase
Structure, RBC makes clear that the transaction was structured to
avoid disclosing that the pre-pay was nothing more than a loan:

> [T]he "effect of the structure [Alberta] is to
> permit Enron Canada to treat the financing as
> a commercial contract and not as debt on its
> balance sheet."

To demonstrate that Enron and its auditor, Arthur Andersen, had
deep concerns about the structuring, Plaintiffs in ¶ 71 quote an
email written by Giles Darby on October 6, 2000 after he attended
a meeting with Enron executives on October 4-5, 2000:

> A lot of our discussion over the course of the
> visit was to seek clarification on why the
> Alberta structure kept changing so much.  The
> explanation came back that it was primarily
> because Andersens (the auditors) are keen to
> ensure that they are seen to be observing
> accounting convention as it develops–evidently
> there have been issues between Enron and them
> for some time now.

[19] The complaint (#26 at ¶ 67) states,

> The final Alberta transaction request, which
> was approved by RBC's Senior Vice President of
> Lending, Bob Hall, described Alberta as a
> "purely financial structure" which Enron had
> used before to achieve off balance sheet
> treatment.  At the time Bob Hall approved the
> Alberta transaction, however, RBC knew that
> off-balance sheet treatment sought by Enron
> would be improper because Enron was the
> ultimate guarantor of the loans and thus could
> not legitimately remove this debt from its
> balance sheets.

Paragraph 68 asserts, "In fact, Frank Piazza, RBC's Vice President
of Group Risk Management, testified that they specifically approved
the Alberta transaction based upon the understanding that the loans
would have full recourse to Enron."   Pressured by time, on
September 27, 2000, at ¶ 69, Blair Fleming admonished in an email,

> This financing will close Friday (sic) (that's
> their quarterend (sic) and if this loan
> doesn't close and get the funding off their
> balance sheet someone at Enron gets shot . . .

structure was approved by RBC on September 27, 2000.   Enron
Examiner Goldin determined that RBC's role in Alberta allowed
Enron to understate its risk, overstate its cash flow from
operating activities and overstate its price management liability.
The Examiner summed up the transaction:  "In essence, RBC paid
C$147 million to Enron Canada up front and ENA was obligated to
pay quarterly interest and principal on that amount.  The floating
cash flow went from Enron Canada to RBC to Chase to ENA.  Hence,
the Alberta prepay was effectively a loan from RBC to Enron."  #26
at ¶ 72.

        The Second Amended Complaint (#26 at ¶¶ 73-97) asserts
that LJM2, structured in 1999 and employed to work a number of
year-end "deals" in which Enron "sold" unmarketable "assets" (that
no legitimate purchaser wanted) to LJM2 so as to allow Enron to
report strong earnings in its year-end financial reports, was
owned and controlled by Enron CFO Andrew Fastow, with his
subordinate Michael Kopper.  Enron reported profits on these sales
and later repurchased the assets.  Even though LJM2 was not
independent, Enron did not report the partnership on its
consolidated financial statements.  RBC, which had routinely
reviewed and analyzed Enron's financial statements from as early
as 1996, knew that LJM2's structure, purpose, and control by Enron
were improper.  One reason was an obvious potential conflict of
interest between those invested in LJM2 and those invested in
Enron stocks and bonds, since Fastow made LJM2's management and
investment decisions, yet was also charged with protecting Enron's

_____

                . so Enron is highly motivated to close!).

interests.[20]  Thus RBC knew that LJM2 should have been consolidated
on Enron's financial statements, that the Raptors (discussed
*infra*), also not independent, should have been reported on Enron's
consolidated financial statements, and that Enron used the Raptors
to manipulate its reported financial results, which in turn
defrauded Plaintiffs and other Enron investors.  In spite of this
knowledge, RBC entered a Revolving Credit Agreement with LJM2 for
$10 million on November 13, 2000 in hopes of gaining more
lucrative transactions with Enron.  #26 at ¶ 74.

The complaint further asserts that Fastow's plea
agreement recited how LJM2 was used to falsify Enron's reported
financial results by falsely inflating its improper earnings and
funds flow, allowing Enron to set excessive market prices for
assets, and keeping poorly performing and volatile assets off
Enron's balance sheet, to help Enron "cook its books" by allowing
Enron to inflate its earnings and reduce its debts, typically near
the quarter-end or year-end of the reporting period, while
improperly keeping its activities off Enron's consolidated
financial statements.  LJM2 was used for a variety of
transactions, including the "sale" of underperforming or
unsellable assets.  Fastow admitted that he and others secretly
agreed that LJM2 would not lose money in the transactions it

---

[20] The complaint notes that LJM2's Private Placement Memorandum
("PPM"), which was given to LJM2 investors but not disseminated to
the public at large, highlighted Fastow's dual role and the
"unusual opportunity" to benefit arising from the partnership's
connection to Enron that was not available otherwise to outside
investors.  The PPM expressly stated that Fastow's "access to
Enron's information pertaining to potential investments will
contribute to superior returns."  #26 at ¶¶ 77-78.

entered into.  As admitted by Fastow in his Plea Agreement, even though LJM2 was not independent, nevertheless its transactions were not consolidated onto Enron's balance sheet but improperly treated as "off-balance-sheet."

According to the complaint, transactions with the four Raptor SPEs, through complex structured finance vehicles, had the greatest impact on manipulating Enron's financial statements.  In three of them, Enron in essence hedged against itself by transferring its own stock, or contracts to receive Enron stock, to the Raptors at a discount price, breaching a basic accounting and financial rule that, except under limited circumstances, a business may not recognize gains due to the increase in the value of its capital stock on its income statement.  LJM2 invested $30 million in each of the Raptors; in October 2000[21] Fastow reported to LJM2 limited partners that the internal rates of return on the four Raptors were 193%, 278%, 2500%, and a projected 125%.

The complaint alleges that RBC knew of Enron's misrepresentations about LJM2 from the beginning.  The potential conflict cause by Fastow's dual role was obvious, and RBC's Risk Management team was concerned from the initial PPM about "significant control issues" and problems with the "valuation" of assets.  The complaint cites or quotes emails and statements of identified RBC officials, showing that RBC knew Enron's actual off-balance-sheet liabilities were far in excess of what Enron

_____

[21] The first Raptor, Talon, was only created in April 2000.

publicly disclosed,[22] but RBC still accepted Enron's invitation to

_____

[22] For example, in a September 20, 2000 email, John Aitken, the head oil & gas industry analyst for RBC, wrote to Frank Piazza,

> the implications of that document for Enron are absolutely enormous. If Bob read it he'd cut the limit by half. . . . If the existing off balance sheet obligations are generally stated as $6.2B . . . I suggest the asset base of the company is spurious and that there are other obligations hidden in these vehicles. . . . the deal itself is a concoction that whilst it may "compensate a valued employee" also benefits Enron, and the equity base of the vehicles is likely inflated by partnership management fees (earned or expected?) treated as equity . . . . its [*sic*] hard to believe this stuff, because it implies the "10 top tier banks" are aware of whats [*sic*] going on.

#26 at ¶ 100. The complaint alleges that an RBC Vice President Pierre LaForest, following a meeting with the London Global Structured Finance Group, reported to Piazza that Enron had close to $16 billion in off-balance sheet debt. *Id.* at ¶ 101. Debra Giles, who performed Risk Assessment Framework ("RAF") for RBC, was asked to investigate and also confirmed that "the London team was aware in September of 2000 that Enron had off-balance sheet liabilities as much as $16 billion" and purportedly determined that Enron was using the LJM2 transactions to manage its financial statements. *Id.* at ¶¶ 109 and 101. LaForest concluded that LJM2 was "below investment grade." *Id.* at ¶ 103. Giles noted "'the significant concern with respect to Enron relates to the company's focus on pushing the edge--on tax optimization, off-balance sheet treatment of obligations, accounting practices, financial structuring, etc.'" *Id.* at ¶ 110. The complaint includes an excerpt of RBC's RAF delineating its concerns with Enron's questionable accounting practices.

> **Accounting Practices**
> Enron's accounting practices can be characterised as "on the edge"--some examples are:
> 1.) Off Balance Sheet Liabilities
>    --The Company expends significant effort and money to obtain off-balance sheet treatment of transactions--this is evidenced by the extent of off-balance sheet liabilities and the level of fees the Company pays to banks every year (approximately $100 million/year).
>    --All transactions are reviewed and

finance LJM2 because "we regard participation as a 'must' in order to position the bank for other transactions which will undoubtedly be generated by Enron in the near future."  #26 at ¶ 102.

The complaint summarizes, "The effect of LJM2 and other SPEs was to eliminate losses of approximately $95,000,000 in 1999 and $8,000,000 in 2000 from Enron's financial statements."  #26 at ¶ 106.

Also in November 2000 RBC became a syndicate member and lender to the "Hawaii Trusts," borrowing SPEs that conducted transactions similar in nature and purpose to those of Cerberus and LJM2.  The transactions involved over-valued assets of Enron and its subsidiaries, with guarantees from Enron; in each, Enron accounted for the loan proceeds as a form of income and treated

---

**approved by Arthur Andersen.**
**2)  LJM Transactions**
   **--Enron publicly reports transactions with companies whose Managing Partner is the CFO of Enron Corp.--these transactions are recorded in the same manner as all other third party transactions.**
   **--There is a possibility that they may be used to manage Enron's financial statements.**
   **--Rating agencies are aware of transactions with the LJM entities.**
**3).  Balance Sheet Management**
   **--Royal Bank employees are aware of transactions which manage the Company's balance sheet at quarter and year-ends.**
**4).  Corporate Negative Pledge**
   **--Transactions such as the monetization of Enron's holding of EOG shares may circumvent Enron's negative pledge to its corporate bankers**
   **-The EOG transaction is most likely one of many of this type.**

Id.   Nevertheless, despite these significant concerns, RBC completed the lucrative LJM2 transactions with Enron on November 13, 2000.

the Hawaii Trusts as "off-balance-sheet" entities and did not consolidate them in its public financial reports.  Required by its own guidelines and by regulatory mandates to scrutinize and assess the risk of each transaction carefully, RBC, according to the complaint, knew or recklessly disregarded the improper accounting for these transactions that materially assisted Enron's fraudulent scheme.  In the fall of 2000, RBC internally concluded that Enron's off-balance sheet liabilities were grossly misrepresented.  *See* footnote 21.  As an example of Enron's "on the edge" accounting practices, RBC knew that the purpose of the Hawaii Trusts was to "'serve as a warehouse vehicle for Enron assets'" and that the structure "'allows Enron to effectively sell (under FASB 125) assets without losing control until a legitimate third party buyer can be located.'"  #126 at ¶ 111.  Nevertheless RBC decided to participate and completed the Hawaii deal in November 2000 by loaning Enron $20 million.

The complaint also alleges that Cerberus (a/k/a Heracles or the "RBC Loan Facility") was one of Enron's largest "off the books" debt-concealment schemes.  RBC lent $517 million to an SPE called Heracles Trust,[23] which RBC created and which was owned and directed by Enron (and thus should have been included in Enron's consolidated financial statements) and which, through the SPE called Cerberus, had a partial interest in an Enron affiliate known as Aeneas L.L.C.  Heracles then gave the $517 million to Aeneas in exchange for shares in EOG Resources, Inc., a spin-off

---

[23] Heracles was a legal trust owned and directed by Enron insiders.

created by Enron in 1999.  Aeneas then sent the money to an Enron subsidiary, Enron Asset Holdings, Inc.  According to falsified financial reports in the year 2000, Enron realized a gain on the value of EOG stock through Heracles' "hedges," accounted for the proceeds of the RBC loan as cash flow, and recorded the gain in value of the EOG shares as income.  It subsequently reported additional profits on the increase in the market value of the Heracles-owned EOG shares, but failed to record as losses a subsequent decline in the market value of those same shares.

According to the complaint, three RBC senior managers, Giles Darby, David Bermingham, and Gary Mulgrew, were recruited by RBC in May 2000 from Greenwich NatWest Bank,[24] which had previously worked with Enron in devising structured transactions to hide Enron's debt.  They were recruited for the specific purpose of structuring unconventional financing arrangements with and for Enron.[25]  The complaint represents that Darby, Bermingham, and Mulgrew, with other senior RBC managers, worked with Enron and helped devise, structure, and implement the Cerberus transaction.

The complaint asserts that RBC, which was sophisticated

---

[24] Mulgrew was appointed Managing Director of RBC's Global Structure Finance Group, and RBC hired the other two.

[25] Darby, Bermingham, and Mulgrew have been indicted and are facing trial this fall for "siphoning approximately $7.3 million into their personal bank accounts from deals related to transactions between LJM1 and NatWest."  #26 at ¶ 123; H-02-CR-0597 (*United States v. Bermingham, et al.*).  They have asserted their Fifth Amendment rights in refusing to testify about their conduct relating to this case.  Plaintiffs point out, "'The Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.'"  *Burdine v. Johnson*, 262 F.3d 336, 366 (5th Cir. 1001)(quoting *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)).  #26 at ¶ 123.

and knowledgeable about "off-balance-sheet" transactions, reviewed copies of Enron's financial reports and knew that Heracles failed to meet requirements for non-consolidation, including independent control and a minimum of 3% ownership by outside investors.  RBC thus knew the reporting of the loan proceeds as cash flow was fraudulent and that RBC's $514 million loan to Heracles was attributable to Enron.[26]   At the time RBC made the loan to Heracles, RBC purportedly knew or recklessly disregarded the fact that Heracles had no assets other than the publicly traded EOG shares, which could fluctuate below the value of the RBC loan. RBC and Enron also knew that dividend income from the shares was not enough to pay the principal and interest on the RBC loan and that Heracles had no independent means to repay the RBC loan.  So with the help of Darby, Bermingham, and Mulgrew, RBC structured the loan to include guarantees that Enron would be ultimately liable for all payments of principal and interest on the loan. RBC first structured a total return swap that obligated Enron to make all payments of principal and interest on the Heracles loan,

---

[26] As evidence that Cerberus transaction was actually a loan to Enron, the complaint at ¶ 118 quotes Pierre LaForest's description of it in a section titled "Facility Proposed" in RBC's January 16, 2001 Exposure Summary Analysis:

> A transaction concluded in November 2000, advancing US$500mm to Enron, thereby monetizing the current market value of Enron's holding of 11.5mm shares of EOG Resources Inc. (11% approx of the outstanding shares of EOG, a listed company).  This was achieved via structured transaction, which involves Enron agreeing to pay interest plus principal on the loan and receiving the dividend income and sales proceeds of EOG shares in July 2002 . . .

in exchange for RBC's receiving EOG dividend payments from Heracles. Then RBC included a "put" option that obligated another Enron subsidiary to buy back the Heracles "class B interest" at full value of the loan upon RBC's demand. (Enron retained the "class A" voting shares held by another Enron-controlled SPE; therefore control and price risk remained with Enron.) The guarantees transferred to Enron the full hazard of the high risk Heracles loan; they demonstrate that RBC knew of the dangers of the loan and decided to eliminate any exposure of itself. Ultimately with the help of Bermingham and Darby, that exposure was allegedly transferred to a party which was ignorant of Enron's financial irregularities and potential for collapse: Rabobank, a large Dutch bank, which agreed to take over the loan in a swap agreement with RBC in January 2001. The complaint points out that the loan was included on RBC's top borrowers list, which indicated that the transaction was approved by RBC's Senior Lending Committee, which was required to implement periodic reviews of the loan.

The cumulative effect of Cerberus was that Enron improperly included US$517.5 million in its operating cash flow for the year ending December 21, 2000, rather than recording it as debt.

As Enron began to implode in the fall of 2001, RBC executives sent emails that reflect how they "knew it all along." For example on October 22 Frank Piazza sent the following email with a news article on Enron attached, to Morten Friis, demonstrating that RBC's partnership with Enron provided RBC with

insider information about Enron's balance sheet liabilities unknown to the investing public:

> A scathing article attached, I have already mentioned my distrust of the CFO.  Until there is a new CFO at Enron, and assuming we can get comfortable with their financial structure, it's hard to see why we should do business with the company.  It's also difficult to believe that the market was not aware of the LJM vehicles as they were disclosed in SEC filings, albeit poorly.  I suspect that the market is not aware of the off-balance sheet leverage in this company.

#26 at ¶ 127.  Similarly, in a November 8, 2001 email to Norm Achen, Piazza revealed that RBC had long been suspicious of Enron's accounting:

> Good old "accounting risk".[*sic*]  We've seen this in the media and telecom sector for the better part of the past few years and now with Enron.  No-one can understand their financial statements.
>
> We need to beef up our internal ability to obtain a positive for the "smelling a rat in the financial statements" test.  While we suspected this for the longest time and had been pressing the company for more information, we could not conclusively prove it without more disclosure from the company.

#26 at ¶ 129.  The complaint summarizes at ¶ 130,

> RBC knew, but recklessly disregarded, that the SPEs and other transactions were shams, that employees and officers of Enron had interests in and control over the SPEs, that the prepay and other "off balance sheet" transactions improperly hid Enron's true financial picture from investors, and that the SPEs and the other transactions should have been reported in Enron's consolidated financial reports.  Simply put, RBC knew that the SPEs and various other sham transactions were designed to misstate Enron's true financial picture and that, as a result of their material assistance[,] Enron's books had been "cooked."

Despite increasing public media revelations and RBC's inside knowledge, Plaintiffs complain that RBC allowed Enron to direct false information about Enron's finances to Plaintiffs.

Plaintiffs claim that in purchasing their Enron securities they relied upon Enron's SEC filings, which were falsified with RBC's aid, and on information obtained from financial information services such as Bloomberg, to which they subscribe. They claim that RBC's transactions with Enron materially altered the "total mix" of information upon which they made their investment decisions.

### IV. Briefing Relating to RBC's Motion To Dismiss

**A. TSA**

RBC contends that Plaintiffs fail to state a claim against RBC for aiding and abetting fraud by Enron under the Texas Securities Act, Texas Revised Civil Statute Annotated Article 581-33F(2), because Plaintiffs have no viable claim of primary liability against Enron since Enron was not a statutory "seller" under the TSA. Article 581-33A(2)( a primary violator is a person who "offers or sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.") *See also* discussion of law in this opinion and order at 11-12.

Plaintiffs respond that they purchased their Enron commercial paper at issue directly from an Enron agent, Lehman Brothers, and thus Enron was a "statutory seller" as to the commercial paper. They also argue that Enron was "in the chain

of the selling process."[27]   Article 581-4E of the TSA, in defining
"sale," "offer to sell," or "sell," includes any act of selling,
including solicitation of sale, an attempt to sell or offer to
sell "directly or by an agent or salesman . . . ."   Plaintiffs
maintain that they have pled and identified material false
statements and omissions by Enron made for the purpose of inducing
and defrauding investors.   Complaint at ¶¶ 21, 22, 33-54, 135.
They have also discussed portions of Fastow's plea agreement,
Koenig's cooperation agreement, Hannon's cooperation agreement,
and Causey's plea agreement to demonstrate how Enron perpetrated
the fraud and that its false and misleading statements were ones
that a reasonable investor would have considered important in
making a decision to invest in Enron securities.

    For the other securities, Plaintiffs assert that Enron
was primarily liable under article 581-33C as a "statutory
issuer."   They point to the complaint at ¶ 31:  "Publicly traded
on the New York Stock Exchange under the symbol ENE, Enron was an
'issuer' of securities for the purpose of applying securities
laws."   They further state that RBC does not dispute that
Plaintiffs' Enron stocks and bonds were registered securities for
which Enron issued prospectuses that incorporated by reference
Enron's materially misleading SEC-filed 10-Ks and 10-Qs.   They

---

[27] *See Brown v. Cole*, 291 S.W.2d 704, 708 (Tex. 1956)(defining
statutory seller, under previous version of TSA, as including any
person who served as "any link in the chain of the selling
process"); *Tex. Capital Sec., Inc, Sandefer*, 58 S.W.3d 760, 775
(Tex. App.–Houston 1st Dist.] 2001, pet. denied)(following *Brown v.
Cole*).   This Court has concluded that *Brown v. Cole*'s very
expansive definition is no longer viable because of the 1977
amendments to the statute.   *In re Enron*, 258 F. Supp.2d at 602-05.

contend that RBC presents no argument or evidence challenging that allegation.   Article 581-33C imposes primary liability against issuers of registered securities purchased on the secondary market, such as the securities purchased by Plaintiffs here. Plaintiffs maintain that Enron as an issuer was a primary violator liable under section 33C.

Aider and abettor liability under article 581-33F(2) applies equally to "a seller, buyer, or issuer."

In reply, RBC objects to Plaintiffs' two newly raised theories that (1) Enron is primarily liable under article 581-33A(2) as a statutory "seller" of the Enron commercial paper to Plaintiffs because Lehman Brothers was acting as an agent for Enron when it sold the commercial paper to Plaintiffs; and (2) Enron is primarily liable under article 581-33C as an "issuer" of the stocks and bonds that Plaintiffs bought in a secondary market. Stating that Plaintiffs have conceded that Enron was not their immediate "seller," RBC notes that this Court has previously rejected the pre-1977-amendment definition of "seller" as including "any link in the chain of the selling process." *See In re Enron Securities, Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 601-08 (S.D. Tex. 2003).[28]   Moreover, RBC

---

[28]  In their surreply (#34 at 22-228), Plaintiffs argue that RBC's argument that a statutory seller must be in privity with the plaintiff ignores federal securities decisions issued contemporaneously with the 1977 TSA amendment, which was explicitly drafted to impart greater protection to investors than § 12(a)(2) as currently interpreted.  Plaintiffs claim that the broad interpretation of a "seller" before the 1977 Amendment to the TSA, the comment to which states that the definition of seller is analogous to that in Section 12 of the Securities Act of 1933, is what the drafters of the TSA intended to apply, not a strict privity definition.  Thus the Court should look only to federal

securities decisions up to the 1977 amendment that provided very expansive definitions of "sell" and "seller" in an effort to effectuate the Act's remedial purpose *See, e.g., Cady v. Murphy*, 113 F.2d 988, 990 (1st Cir, 1940); *Zachman v. Erwin*, 186 F. Supp. 681, 685-97 (S.D. Tex. 1959).

The Court observes that Fifth Circuit first took a proximate cause approach to defining a § 12 "seller," and later refined it to reach defendants whose actions were a "substantial factor" in causing a plaintiff to purchase securities. *Hill York Corp. v. American International Franchises*, 448 F.2d 680, 695 (5th Cir. 1971)("seller" is not limited to person who passed title); *Lewis v. Watson & Co.*, 487 F.2d 617, 621-26 (5th Cir. 1973)(even though broker was not a conventional seller, i.e., person who parts with the stock in exchange for consideration, broker's actions were a "substantial factor" and proximate cause of Plaintiffs' purchases). The Fifth Circuit's doctrine was subsequently abrogated by *Pinter V. Dahl*, 486 U.S. 622, 649-51 (1988)("There is no support in the statutory language or legislative history for expansion of § 12(1) primary liability beyond persons who pass title and persons who 'offer," including those who 'solicit' offers. Indeed, § 12's failure to impose express liability for mere participation in unlawful sales transactions suggests that Congress did not intend that the section impose liability on participants' collateral to the offer or sale. When Congress wished to create such liability, it had little trouble doing so.").

As noted, this Court's decision, while rejecting as too expansive the definition in *Brown v. Cole*, "any link in the chain of the selling process," did not limit the term "seller" by a privity requirement, but allowed some extension where the plaintiff could show that the party, here allegedly Lehman Brothers, was acting as a broker or agent of the vendor, here Enron. 258 F. Supp. 2d at 606. *See also* Alan R. Bromberg, *Civil Liability under Texas Securities Act § 33 and Related Claims*, 32 Sw. L.J. 867, 890-91 (1978-1979)(Although the definition of the class of defendants ("a person who offers or sells" is the same in the 1977 version of the statute as it was in 1963,

> a narrower interpretation of the phrase is required by the 1977 addition of specific provisions to cover the different standards . . . . Section 33C makes issuers liable for untruths and omissions when they register outstanding securities for secondary sale by the holders, and § 33F makes control persons and aiders liable in certain circumstances . . . . By § 33f(1), a control person of a § 33A(1) defendant has a reasonable care defense that he would not have under § 33A(1) if he were a "person who offers or sells." By § 33F(2), and aider of a § 33A(1) defendant must be a material aider and is liable only if he acts with the specified intent (to deceive or

charges that Plaintiffs are obfuscating the distinction between a securities "dealer" and an "agent." The TSA defines "dealer" to "include every person or company other than an agent, who engages in this state . . . directly or through an agent, in selling, offering for sale or delivery or soliciting subscriptions to or orders for . . . any security or securities . . . ." Tex. Rev. Civ. State. art. 581-4(C)(2006). The TSA, consistent with Section 3(a)(5) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(5)(2007)("'dealer' means any person engaged in the business of buying and selling securities for [his] own account'), states that the term "dealer" includes "a securities professional selling for his own account, often called a principal and embracing a market maker . . . ." Alan R. Bromberg, *Civil Liability under Texas Securities Act § 33 and Related Claims*, 32 Sw. L.J. 867, 927 (1978-1979); *see also* 4 *Banking Law* § 96.13[1] (Matthew Bender & Co. 2000)("Dealers purchase paper from issuers and place it with investors."). In their Second Amended Complaint at ¶¶ 31 and 200 in G-02-0463 (#31) and in their opposition brief in this case (#32 at 27 n.5), Plaintiffs indicate that they purchased their Enron commercial paper directly from Lehman Brothers out of its inventory (without mentioning any involvement from Enron); thus

---

defraud) or reckless disregard (for the truth or the law). Materiality should be a requirement for a § 33A(1) 'person who offers or sells,' but has not always been recognized as such. And intent or recklessness is not required of § 33A(1) defendants. Thus peripheral defendants should be tested by the carefully proscribed standards of § 33C and 33 F rather than by a loose interpretation of the general phrase, "person who offers or sells."[footnotes omitted].

Lehman Brothers was acting as a principal, not as an agent, in selling the commercial paper for its own account to Plaintiffs. Enron did not actively solicit the sale to Plaintiffs of the securities so as to become the vendor's agent. *In re Enron Corp. Securities, Derivative, & "ERISA" Litig.*, 258 F. Supp.2d 576, 606 (S.D. Tex. 2003).

As for their argument that Enron is a non-selling "issuer" for purposes of primary liability under article 581-33C, RBC argues that the express language of 581-33C indicates that it applies only to an issuer registering securities for sale by owners under either Section 7 of the TSA or Section 6 of the Securities Act of 1933. Hal Bateman, in *Securities Litigation*, 15 Houston L. Rev. at 849, concluded, "This means that Section 33C will apply only to registered secondary offerings by persons other than the issuer and will not apply in primary offerings by the issuer itself." RBC further observes that Professor Bromberg, the primary draftsman of the 1977 amendments to the TSA, similarly explains that article 581-33C "makes issuers liable for untruths and omissions when they register outstanding securities for secondary sale[29] by the holders." Alan R. Bromberg, *Civil*

---

[29] RBC notes that *Black's Law Dictionary* at 1351 (6th ed. 1990) defines a "secondary offering" or "secondary distribution" as a "distribution of stock after it has been initially sold by the issuing corporation. It is not a new issue, but rather a public sale of stock which has previously been issued and held by large corporations and investors." *See also Krim v. PCOrder.com*, 402 F.3d 489, 491 n.4 (5th Cir. 2005)(the "aftermarket" or "secondary market" is the "securities market in which previously issued securities are traded among investors"). RBC point out that the comments to 33C observe that a typical issuance under that section is where certain control persons sell portions of their previously issued shares to the market through a secondary offering. Tex. Rev. Civ. Stat. Ann. art. 581-33 cmt. at 95-96 (Vernon's 2004

*Liability under Texas Securities Act § 33 and Related Claims*, 32
Sw. L.J. 867, 890 (1978-1979).  Moreover, argues RBC, the express
language of 581-33C indicates that it applies only to an issuer
registering securities for sale by owners under either Section 7
of the TSA or Section 6 of the Securities Act of 1933.  Bateman,
15 Hous. L. Rev. at 849 ("Section 33C will apply only to
registered secondary offerings by persons other than the issuer
and will not apply in primary offerings by the issuer itself.");
*see also* Bromberg, 32 Sw. L.J. at 890 (Section 33C "makes issuers
liable for untruths and omissions when they register outstanding
securities for secondary sale by the holders.").  Thus Plaintiffs'
conclusory allegation that Enron's securities were registered and
traded on the New York Stock Exchange, by itself, is inadequate
to state a claim because Plaintiffs do not allege and almost
certainly cannot prove that the securities they purchased on the
secondary market are traceable to a registered **secondary**, not a
primary, offering. Plaintiffs confuse "securities in a registered
secondary offering" (the subject of Section 33C), with "registered
securities purchased on the secondary market," such as the
securities purchased by Plaintiffs here. *Krim v. PCOrder.com*, 402
F.3d 489, 491 n.4 and 498-99 (5th Cir. 2005)(the "aftermarket" or
"secondary market" is the "securities market in which previously
issued securities are traded among investors"; the court
highlighted the difficulty of tracing securities purchased in the
aftermarket to a specific offering in the context of Section 11

———————————————

Supp.).

of the 1933 Act[30] and rejected the argument that plaintiffs could

---

[30] Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, is the federal statute most analogous to article 581-33C of the TSA. *See* Tex. Rev. Civ. Stat. art. 581-33C cmt. (stating that article 581-33C "is similar in effect to U.S. Securities Act § 1, 15 U.S.C. § 77k"). Both are strict liability statutes that would impose liability if a company makes a public offering of securities pursuant to a false registration statement (only § 11) or prospectus (both), even if the material misstatement is made innocently, and a plaintiff is not required to prove reliance. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 572 (1995)(stating that Section 11 is "chiefly concerned with disclosure and fraud in connection with offering of securities"); Tex. Rev. Civ. Stat. art. 581-33C cmt. (stating that article 581-33C creates liability for a material untruth or omission in a prospectus for a secondary offering); *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 945 (5th Cir. 2005)(stating that section 11 creates "virtually absolute" liability for issuers); Bateman, *Securities Litigation*, 15 Hous. L. Rev. at 849-50 (stating that article 581-33C is a strict liability provision).

Standing under Section 11 is limited to "any person acquiring such security" under the materially misleading registration statement or to those aftermarket purchasers able to "trace" the security back to the misleading registration statement at issue (restricting standing to a "subset of security owners"). *Krim*, 402 F.3d at 494-97. Article 581-33C has similar language (only a person "buying the registered security" under a materially misleading prospectus can sue) and should be therefore interpreted the same way as the federal statute. *Sterling Trust Co. v. Adderley*, 168 S.W.3d 835, 840 (Tex. 2003)("the Legislature intended the TSA to be interpreted in harmony with federal securities law"); *Anheuser-Busch Co. v. Summit Coffee Co.*, 858 S.W.2d 928, 939 (Tex. App.--Dallas 1993, writ denied)(stating that decision from federal courts analyzing federal securities laws are reliable guides for interpreting provisions of the TSA), *vacated on other grounds by* 514 U.S. 1001 (1996), *on remand*, 934 S.W.2d 705, 708 & n.6 (Tex. App.--Dallas 1996)(writ dismissed by agreement Oct. 24, 1996)(declining to interpret article 581-33(A)(2) in accordance with the Supreme Court's interpretation of 15 U.S.C. § 77(2) because the language of the two provisions was different; specifically the phrase in article 581-33(A)(2), "by means of a prospectus or oral communication," is broader than that of its federal counterpart and the article therefore is not governed by *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995)).

Nevertheless, Bateman, in *Securities Litigation*, 15 Hous. L. Rev. at 849-50, notes that liability under article 581-33C is "quite unusual in state securities law":

> Although it bears close similarity to the liability created in section 11 of the Securities Act of 1933, substantial differences exist. Liability under section

satisfy the tracing test by showing a very high statistical probability (90%) that they each owned at least one share issued under the defective registration statement rather than that they actually did).

RBC further argues that the Texas Blue Sky Laws were not intended to protect sophisticated investors like Plaintiffs.[31] RBC maintains that article 581-5H expressly exempts certain transactions from provisions of the TSA. It clearly and unambiguously states that Section 33C does not apply to the sale of securities to insurance companies and investments companies: "Except as herein in this Act provided, the provisions of this Act shall not apply to the sale of any security when made in any of the following transactions and under any of the following conditions," including subdivision H, " The sale of any security to any bank, trust company, building and loan association, insurance company, surety or guaranty company, savings institution, investment company and defined in the Investment Company Act of 1940, small business investment company as defined in the Small Business Investment Act of 1958, as amended, or to any registered dealer actually engaged in buying and selling

---

33C only extends to the prospectus, not to the entire registration statement, and it applies only in secondary and not in primary distributions. The only defendant under section 33C is the issuer and no due diligence defense is available.

[31] The Investment Company Act of 1940 identifies insurance companies and investment companies as "sophisticated investors" that are "deemed so knowledgeable with respect to their investments that they do not need the protection of blue sky registration provision." 1 Robert N. Rapp, *Blue Sky Regulation* § 803[6] (2d ed. Matthew Bender & Co. 2007).

securities." In the instant case, Plaintiffs American National Insurance Company, American National Property Casualty Company and Standard Life and Accident Insurance Company are identified in the Second Amended Complaint at ¶ 1 as insurance companies. RBC urges this Court to take judicial notice from SEC-filed registration statements of the fact that the remaining Plaintiffs are investment companies registered under the Investment Company Act of 1940.[32]

Although section 5H explicitly permits the legislature to exempt provisions of the TSA from the reach of article 581-5 if the legislators incorporate express language to that effect. For example both articles 33A(2) and B expressly state that liability to sellers or offerors attaches regardless of "whether or not the security or transaction is exempt under Section 5 or 6 of this Act." Section 33C lacks such qualifying language, so pursuant to the clear language of Section 5H, issuers are not liable under Section 33C for misrepresentations in prospectuses in connection with securities sold to insurance companies or investment companies.

_____

[32] RBC submits SEC-filed registration statements under the Investment Company Act of 1940, Exs. 1-2, Declaration of Mary Cazes Greene in Further Support of the RBC Defendants' Motion to Dismiss Second Amended Complaint (#33). Because the statements are matters of public record and not subject to reasonable dispute, judicial notice is proper. Fed. R. Evid. 201(d) and 9(f); *Lovelace v. Software Spectrum*, 78 F.3d 1015, 1017-18, 1021 (5th Cir. 1996)(taking judicial notice of statements contained in documents that were required to be filed with the SEC and affirming a motion to dismiss securities fraud claim for failure to plead fraud with particularity.
    Plaintiffs Farm Family Life Insurance Company, Farm Family Casualty Company, and National Western Life Insurance Company asserted only common law holder claims, which Plaintiffs have stated that they are no longer pursuing.

Finally RBC complains that for the first time Plaintiffs conclusorily allege in Plaintiffs' opposition brief that Enron issued (unidentified) prospectuses which incorporated by reference false and deceptive information (also unidentified) in (unspecified) Enron SEC-filed statements. There is also no statement that the prospectuses on which they base liability under Section 33C related to the securities that Plaintiffs purchased. In sum, argues RBC, Plaintiffs fail to state with the requisite particularity an actionable claim that Enron committed a primary violation of Section 33C as an "issuer" of the securities purchased by Plaintiffs in a secondary market.

RBC asks the Court to strike these new arguments, which were not pleaded in the complaint, but only raised for the first time in an opposition brief to the motion to dismiss.

In their surreply (#34), Plaintiffs argue (1) that RBC's interpretation of article 581-33C lacks legal authority and (2) that legislative history, principals of statutory construction, rules and decisions by the Texas State Securities Board ("TSSB"),[33]

---

[33] The TSSB, a regulatory body is composed of three Texas citizens, appointed by the Governor with the advice and consent of the Senate, for six-year terms. The Board appoints a Commissioner and serves under the Commissioner's supervision. The Board is authorized to adopt rules to implement the TSA after a notice and comment period, and has delegated that authority to the Commissioner, who also makes determinations about exemptions from registration requirements and takes enforcement actions against issuers who fail to register their securities properly and against selling agents and dealers for infractions of its rules. *See generally* Lipsman, 22 Hous. L. Rev. at 732-35; George Lee Flint, Jr., *Securities Regulation*, 59 SMU L. Rev. 1541, 1543-48 (Summer 2006).

and logic[34] support Plaintiffs' view that the statute does not shield RBC from liability for aiding and abetting fraud.

Rejecting RBC's interpretation of article 581-33 and noting that RBC has the burden of pleading and proving an exemption under article 581-5,[35] Plaintiffs object to RBC's conclusion that article 581-33C is exempt from TSA's antifraud provisions, based on the absence in section 33C of the qualifying language found in both 33A(2) and 33B ("whether or not the security or transaction is exempt under Section 5 or 6 of this Act"), is improbable and unsupported. They insist that the statutory history of article 581-33C shows that it is a limitation of defenses, not of liability. They also maintain that the exemptions under section 5H do not apply because the Enron securities at issue here were registered and liability attaches as long as there were misrepresentations in Enron's registration statements.[36]

More specifically, Plaintiffs argue that the comments to the 1963 amendment to article 581-33 reflects the purpose of

---

[34] Plaintiffs argue that if section 5 and 6 exemptions were applied to 33C, the result would be "to gut and remove from protection the very securities and transactions that section 33C, by its own terms, was expressly designed to include. For example, all securities listed on major exchanges would be exempt." #34 at 20.

[35] *Jones v. Latham*, 671 S.W.2d 612, 614 (Tex. App.–Eastland 1984, no writ), *citing Brown v. Cole*, 291 S.W.2d at 711.

[36] This Court observes that Plaintiffs' surreply does not address the question of secondary offerings nor whether the misstatements were in prospectuses relating to the same securities that Plaintiffs purchased, no less identify those misstatements.

the statute and indicates why RBC's construction of it is
erroneous:

> The manifest purposes of a civil liability
> provision are to indemnify victimized
> purchasers and to encourage private
> enforcement of the Act.   The prior Texas
> provision fell short of these goals in a
> number of respects, some of which represented
> gaping loopholes. (1) Exempt securities and
> exempt transaction were not covered even
> though material omissions or misstatements
> may have been made . . .
> *Changes Effect*.   These shortcomings are
> largely cured by the 1963 amendments:  (1)
> **Exemptions are irrelevant if material
> misstatements or omissions are made**.
> [emphasis added]

Section 33C was added in 1977.  The comments to the 1977
amendments of article 581-33 state that "the major change in sec.
33(A)(2) is that some defendants may avoid liability for an
untruth or omission by showing that they did not know and could
not, by a reasonable care, have known of the untruth or omission."
They explain that Section 33C was added at the same time that
33(A)(2) was amended to include a "due diligence" defense;
Plaintiffs argue that section 33C was intended to clarify that the
new defense under section 33(A)(2) was not available if the
omission or material misstatement occurred in registration
statements, but only a prospectus:  "If the prospectus required
in connection with the registration contains, as of its effective
date, an untrue statement of material fact or an omission . . .
the issuer is liable to a person buying a registered security .
. . ."  Comment to Art. 581-33C 1977 Amendments.  The Comments to
section 33C further state, "33C does not exhaust an issuer's
liabilities. . . . A non-selling issuer may also be liable for

violations of a seller if the issuer is in control of the seller [33F(1) and 33A] or fraudulently aids him '33F(2) and 33A]."[37] Under the section entitled <u>Who May Use Defense</u>, the comment to section 33A(2) lists

> (1) Municipal issuers . . .
> (2) Other issuers but not with respect to untruths or omissions in a prospectus required in connection with a Sec. 7 registration. . . . But ordinary annual, quarterly and other reports to shareholders, proxy statements, and similar communications are subject to the reasonable care defense. . . .

Plaintiffs maintain that the language in 33A(2) and 33B ("whether or not the security or transaction is exempt under Section 5 or 6 of this Act"), but absent in 33C, does not mean the exemption in 581-5H applies to bar them from bringing TSA claims, specifically asserting a primary violation by Enron under section 33C. Plaintiffs argue that the purpose of Sections 5 and 6 is to list exemptions to registration requirements specified in other sections of the TSA, especially section 7 (registration of securities) and section 12 (registration of persons selling securities). Insisting that the language of section 33C "presupposes registration," Plaintiffs contend that "[b]ecause sections 5 and 6 list exemptions to *registration requirements*, it would be redundant--if not illogical-to state that Section[s] 5 and 6 registration exemptions do not apply to Section 33C liability for registered securities. Thus, by its very definition, the text of section 33C specifically removes the

---

[37] The Court observes that Plaintiffs have not alleged that Enron controlled the seller or aided and abetted the seller.

provision from the application of section 5 and 6 listings of transactions and securities exempt from registration."  # 34 at 18. #34 at 18.

Plaintiffs urge that secondary authority supports their argument.   The purpose of article 581-33C was "to combat fraud without regard to sections 5 and 6 exemptions." #34 at 19, *citing* Bromberg, 32 Sw. L. J. at 890 ("section 33 makes issuers liable for untruths and omissions when they register outstanding securities for secondary sale by the holders."); *id.* at n.79 ("§ 33C does cover violations that might otherwise be actionable under § 33A(2)").  *See also* Steven M. Lipsman, *Exemptions Under the Texas Securities Act:  A Logical Framework for the Practicing Attorney*, 22 Hous. L. Rev. 725, 729 (1985)("Nor does an exemption remove a particular security from the scope of the  TSA.  Sections 5 and 6, the exemption provisions of the TSA, provide only that exemptions apply unless otherwise indicated in the statute.  Thus securities transactions which qualify under one of the statutory or regulatory exemptions are still subject to the anti-fraud provisions of the TSA.").   In sum, Plaintiffs insist that registration is not relevant for 33C actions and thus 33C is not subject to section 5 and 6 exemptions.  Therefore they conclude, Plaintiffs, as insurance companies, may bring actions under article 581-33C.

Plaintiffs also argue the TSSB does not allow a party to use exemptions to avoid liability in an overall scheme to defraud.   7  Tex.  Admin.  Code  §  109.13(k)(13)(Vernon 2007)("[Exemptions from the Act are not available] to any issuer

with respect to any transaction which, although in technical compliance with this subsection [limited offering exemptions], is part of a plan or scheme to evade registration or conditions or limitations explicitly stated in this subsection."). In adding vigor to its anti-fraud statutory scheme, the Code also expands the definition of "issuer" to include "any of the issuer's predecessors or any affiliated issuer," as well as "any person who, acting alone or in conjunction with one or more other persons, directly or indirectly takes initiative in founding and organizing the business or enterprise of an issuer." 7 Admin. Code § 139.16(c)(2)(A) and (c)(2)(C)(i). Plaintiffs maintain that the TSSB and the case law address sections 5 and 6 only in terms of registration requirements. Furthermore Plaintiffs claim to rely on rules of statutory construction, in essence arguing that the more specific provisions of the 1977 amendment should be given effect over the more general provision of the earlier statute, to demonstrate that section 33C is not exempt from the TSA's antifraud provisions. #34 at 20-21.

In their memorandum (#36) addressing these new arguments in #34, RBC emphasizes that in G-02-723, #76 at 37, this Court concluded that as a matter of law Plaintiffs, which are either insurance companies or investment companies as defined under the Investment Company Act of 1934, are excluded from asserting a primary violation claim against Enron under article 581-33C.[38]

---

[38] This Court notes that Plaintiffs never responded to that argument, put forth by Defendant Merrill Lynch in G-02-723.

RBC urges the Court to continue to follow a well established tenet of statutory interpretation that in the absence of clearly expressed legislative intent to the contrary, the clear, unambiguous language of the statute, as written, controls. Section 5 states clearly that the TSA "shall not apply" to the transactions it lists unless "specifically provided" for otherwise. Article 581-5H lists the sale of securities to insurance and investment companies as transactions to which article 581-33C does not apply. Thus Plaintiffs lack standing to assert a claim against Enron under section 33C. *Brown v. Lair*, 742 S.W.2d 432, 437 (Tex. App.–Amarillo 1987, no writ)(Article 581-5 states that "the Act 'shall not apply to the sale of *any* security when made in *any* of the following transactions and under *any* of the following conditions. . . ; that is to say the provisions of this Act shall not apply to *any* sale . . . of any security under *any* of the following transactions or conditions . . . .' We must assume that the legislature meant what it said. Here it said any transaction listed in article 581-5 is exempt. It did not place limits on the use of the exemptions or suggest that only one exemption is available for each venture."). Because the language of the statute is clear and unambiguous, urges RBC, analysis of legislative history is irrelevant. *Burlington N.R.R. Co. v. Okla. Tax Comm'n*, 481 U.S. 454, 461 (1987).

Moreover, Plaintiffs' claims about that legislative history are misleading, RBC maintains. In the 1963 amendments to the TSA, the phrase "whether or not the security or transaction is exempt under Section 5 or 6" was added to section 33A and

remains there today.   In contrast, fourteen years later the legislature added Section 33C without such language, demonstrating an intent that insurance companies, investment advisors and other sophisticated investors may invoke the anti-fraud provisions of Sections 33A and 33B, but not 33C.   *Quest Medical, Inc. v. Apprill*, 90 F.3d 1080, 1091 (5th Cir. 1996)(in discussing the TSA, "legislative intent can be inferred from the absence or presence of a particular provision in a statute"); *Kerrville HRH, Inc. v. City of Kerrville*, 803 S.W.2d 377, 382 (Tex. App.--San Antonio 1990, writ denied)("While every word in the statute must be presumed to be used for a purpose, it is also the case that every word excluded from the statute must be presumed to have been excluded for a purpose.").

RBC insists that Section 33C was not intended to limit defenses; rather it was added to narrowly expand liability of issuers that register their outstanding securities for sale by someone else (i.e., in a registered secondary offering), since in those circumstances an issuer would avoid seller liability under Section 33A(2).  Tex. Rev. Civ. Stat. Ann. Art. 581-33 cmt. at 95 (Vernon's 2006 Supp.); Bateman, 15 Hous. L. Rev. at 849 (Section 33C adds an "entirely new liability provision for issuers of securities in certain cases.").

RBC highlights the fact that in actuality Plaintiffs fail to cite any authority for their interpretation of the provision.  Although mentioning decisions by the TSSB generally, they fail to address any one specifically.  Instead they cite a provision of the Texas Administrative Code identifying conditions

on limited offering exceptions, § 109.13(k)(13)(2007), and suggest that it applies to Section 5H.  They also define terms relating to individual accredited investors (Tex. Admin. Code § 139.16(c)(2007) and two papers presented at conferences by the TSSB Securities Commissioner that have no relation to Section 33C. Surreply at 19-20.  RBC also objects to Plaintiffs' erroneous suggestions (1) that there is a conflict between the exemption for listed securities in Section 6F of the TSA and Section 33C; and (2) that all securities registered under sections 7A, 7B, or 7C of the TSA or section 6 of the 1993 Act are exchange market listed and thus the exemption in Section 6F subsumes Section 33C. Surreply at 20-21.  RBC points out that Section 7 of the TSA and Section 5(a) of the 1933 Act require public offerings of securities to be registered, but do not require issuers to list those securities on an exchange or on the NASDAQ national market, a choice which is voluntary; thus "the universe of securities that are registered is far greater than those that are listed on an exchange or the NASDAQ . . . ."  #36 at 10.

RBC maintains that the TSA was not enacted to protect sophisticated investors like Plaintiffs.  *See* Lipsman, 22 Hous. L. Rev. at 727 (The TSA's standard of preventing the sale of securities that the TSSB determines are not "fair, just and equitable" is designed to protect the "'widow-orphan' investment class" of vulnerable investors "through four methods of regulation: securities registration, disclosure, dealer licensing and fraud prevention.").

B.   Common Law Fraud

RBC maintains that Plaintiffs fail to state a claim under common law fraud because Plaintiffs have not alleged an actionable misrepresentation or material non-disclosure by the RBC Defendants nor demonstrated that RBC owed a duty to disclose such a misrepresentation to Plaintiffs.  *See* discussion of law in this opinion and order at 17–21.   Instead Plaintiffs' fraud claims against RBC are based on statements by Enron.

Plaintiffs respond that they have alleged that RBC and Enron engaged in a civil conspiracy to commit common law fraud. The complaint identifies sworn statements by Enron officials (1) Richard Causey that Enron knowingly and purposefully made false and misleading statements in SEC filings and other public statements and (2) Kevin P. Hannon that Enron's representations about its broadband business contained materially misleading claims and omissions.  Enron's fraudulent statements are imputed to RBC because RBC joined in a conspiracy with Enron to enter into sham financial transactions with the intent of materially altering Enron's financial statements, which RBC knew were false because it was aware of Enron's actual financial condition and Enron's false reporting of RBC's own transactions with Enron, as evidenced by factual allegations in the pleadings.  Plaintiffs have claimed that they relied on the SEC filings and Enron's representations reported in financial services, which RBC's material assistance helped make false.  Plaintiffs insist they were justified in relying on the SEC statements, which were the basis of numerous general-circulation financial publications recommending the purchase of Enron securities.

In reply, RBC contends that Plaintiffs have not adequately alleged reliance, but merely conclusorily stated that they relied on unspecified representations in Enron's SEC-filed financial statements and unidentified information from financial information services.

C.  Section 27.01(d)

RBC argues that Plaintiffs fail to state a claim under § 27.01(d) of the Texas Business and Commerce Code (applies "to those who have benefitted from the specific sale of . . . stock in which the fraud occurred because Plaintiffs fail to allege **with specificity** that (a) the RBC Defendants had a duty to Plaintiffs to disclose Enron's alleged misrepresentations, (b) that RBC Defendants directly benefitted or how they benefitted from any of the stock transactions in which the fraud occurred,[39] and not just generally from RBC's relationship with Enron, and (c) that Plaintiffs actually and justifiably relied on any of Enron's alleged misrepresentations in purchasing the securities at issue. *See* discussion of law in this opinion and order at 21-24.  Instead Plaintiffs plead only conclusory reliance on nonspecific statements by Enron filed with the SEC and unidentified information from financial services.

Plaintiffs respond that the statute itself imposes liability on a person who, with awareness of the falsity of a

_____

[39] Section 27.01(d)(3) imposes liability on a party that "benefits from the false misrepresentation."  RBC cites *IQ Holdings v. Arthur Andersen LLP*, (*In re WorldCom Sec. Litig.*), No. 02 Civ. 3288 (DLC), 2006 WL 1047130, *6 (S.D.N.Y. Apr. 21, 2006)((Section 27.01(d)(3) "applies to those who have benefitted in the specific sale of real estate or stock in which the fraud occurred, for instance a company who receives fees in a real estate closing.").

representation made by another, fails to disclose the falsity of that representation to the person defrauded. The complaint alleges that RBC had actual knowledge of the improper accounting and fraudulent misrepresentations made by Enron about its financial condition because it knew that its own transactions with Enron were not properly disclosed in Enron's SEC 10-Q and 10-K filings. *See, e.g.,* complaint at ¶¶ 153-56.

As for benefits to RBC, Plaintiffs argue that RBC's actual awareness of the falsity of Enron's representations and failure to disclose it resulted in Plaintiffs' purchase of their Enron securities, which in turn allowed RBC to continue its lucrative dealing with Enron and to obtain additional consulting business from Enron as a reward for concealing the truth from investors. They contend that RBC provides no authority for its argument that a plaintiff must be able to trace a particular dollar that was used to purchase the security to the pocket of the statutory violator. RBC plainly benefitted from its failure to disclose Enron's wrongdoing, which RBC assisted.[40]

---

[40] But see also *Belton v. Dover Properties Sales, Inc.*, Civ. No. 3-85-0557-H, 1985 WL 8797 (N.D. Tex. 1986), in which a defendant, Southwest, moved to dismiss the section 27.01 claim on the grounds that the plaintiffs failed to allege that the defendant benefitted from the false representations and the defendant received only the customary fees of the closing itself. The court concluded that

> this claim survives Defendants' motion. Regardless of the conspiracy claim, if Southwest had knowledge of the alleged misrepresentations and failed to disclose them, and if Plaintiffs were thus induced to consummate the transaction when they would not have otherwise done so, Southwest's receipt of its customary fees would constitute a benefit from the false representations because the

In reply, RBC contends that Plaintiffs have not adequately alleged reliance for statutory fraud because they have not adequately identified the misrepresentations in Enron's SEC-filed financial statements nor the misinformation from the financial information services. Moreover, since Plaintiffs did not and cannot allege that they had a special relationship with RBC, they cannot show that RBC owed Plaintiffs a duty of disclosure of any wrongdoing. No court has read the statute as broadly as Plaintiffs to itself imply a duty at large to disclose wrongdoing. Courts have uniformly held that a party cannot be liable under § 27.01(d) for failure to disclose absent a breach of an independent duty to disclose, in accord with the common law rule. *See* #30 at 10-11. Even if it knew of Enron's misrepresentations, RBC insists it had no such duty to disclose. RBC further argues that not only have Plaintiffs failed to allege that they were induced by the misrepresentations and information into entering into a contract to purchase the securities at issue, but they have not and cannot plead with specificity that RBC benefitted from those transactions. Moreover Plaintiffs merely

---

fees would not have been received if the desired disclosure was made. There is no indication that the statute intended to limit the realm of those liable to grantors and grantees.

*Id.* at *3, cited in *IQ Holdings*, 2006 WL 1047130 at *6 (section 27.01(d) "applies to those who have benefitted in the specific sale of . . . stock in which the fraud occurred"). RBC does not assert that it benefitted in any way from the specific sales of Enron securities to Plaintiffs at issue here, but only from receipt of other subsequent benefits in reward for aiding Enron earlier. RBC maintains that it had no part in, and received no fees or commissions from, Plaintiffs' purchases of Enron's securities.

include a conclusory allegation that they actually and justifiably relied on Enron's misrepresentations rather than plead with particularity.

In their surreply Plaintiffs reiterate that RBC's duty to disclose arose from the statute, which the Legislature enacted with the intent of protecting real estate and stock purchasers from fraudulent land and stock schemes. Tex. H.B. 3, 36 Leg., p. 77, c.43 (1919)(Texas Civil Statute article 4004, section 27.01's predecessor). The plain language of the statute, imposing liability on a defendant who, with knowledge of the primary violator's false statements, "fails to disclose the falsity of a representation" and benefits from such silence, along with the rules of statutory construction,[41] confirms that the statute itself creates a duty to disclose.[42]  Imposing an independent duty to

---

[41] *See* #34 at 8-10.

[42] Plaintiffs distinguish statutory fraud from common law nondisclosure fraud, which requires that a plaintiff show an independent duty to disclose. They argue that the express language of the statute itself creates a duty to disclose. They further contend that a case cited as authority  by RBC, *1994 Land Fund II-Dallas 1, L.P. v. Ramur, Ind.*, 2001 Tex. app. LEXIS 765 *23 (Feb. 5, 2001), analyzes the two causes of action separately. After reviewing *Land Fund II*, this Court disagrees. In the portion of the case referenced by Plaintiffs, *Land Fund II* talks consecutively about elements of fraud under § 27.01: first the element of actual awareness and then the duty to disclose in the next paragraph. In fact, later in the opinion, *id.* at *7, it is obvious that the *Land Fund II* court is discussing conspiracy to commit fraud and, as the sole underlying cause of action, fraud in a real estate transaction under § 27.01(d); common law fraud is not involved:

> We conclude the evidence is sufficient to raise a fact issue on whether there was a meeting of the minds between Ramur and Watson to fraudulently secure the release of lien on Lot 2, whether Ramur performed an overt act in furtherance of the conspiracy in its

disclose (as in common law fraud)[43] that is not included in the text of the statue violates the rule that courts should not construe statutes in a way that "adds words not found in the statute." *Brown v. Aetna Cas. & Sur. Co.*, 837 S.W.2d 99, 1000 (Tex. 1992).

D.  Civil Conspiracy to Commit Fraud

---

correspondence with the RTC, whether Ramur knowingly made false representations to the RTC, whether Ramur created a duty to disclose by making a partial disclosure that conveyed a false impression, and whether Ramur or Watson concealed or failed to disclose information that either had a duty to disclose.  Because there is some evidence on each of the challenged elements, summary judgment was improper.  We therefore sustain Land Fund's third issue as it relates to the claims for fraud in a real estate transaction and conspiracy to commit fraud in a real estate transaction.

Thus the discussion of the independent duty to disclose related to statutory fraud.  Other courts have concluded that statutory and common law fraud have essentially the same elements.  *See Oppenheimer v. Prudential Sec. Inc.*, 94 F.3d 189, 104 (5th Cir. 1996)("The elements that are necessary to state a claim of common law fraud are basically identical [to those for statutory fraud]"); *Robbins v. Capozzi*, 100 S.W.3d 18, 26 (Tex. App.--Tyler 2002, no pet.)("A cause of action for statutory fraud differs from the common law cause of action only in that it does not require proof that the false representation was made knowingly or recklessly," but it must be made with the intent to induce the claimant into entering the transaction), *citing Larsen v. Carlene Langford & Assoc., Inc.*, 41 S.W.3d 245, 249 (Tex. App.--Waco, 2001, pet. denied)(same); *Fletcher v. Edwards*, 26 S.W.3d 66, 77 (Tex. App.-- Waco 2000, pet. denied)(same); *Brush v. Reata Oil and Gas Corp.*, 984 S.W.2d 720, 726 (Tex. App.--Waco 1998, pet. denied)(same)(and cases cited therein).

[43] As noted earlier, an affirmative duty to disclose arises in four circumstances:  (1) where there is a fiduciary or confidential relationship between the parties; (2) where a person voluntarily discloses information, he must disclose the whole truth; (3) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (4) when a person makes a partial disclosure and conveys a false impression. *Hoggett*, 971 S.W.2d at 487.

RBC also claims that Plaintiffs have failed to state a claim for civil conspiracy to commit fraud because Plaintiffs fail to adequately plead two key elements, specifically (1) a combination, agreement, or "meeting of the minds" between RBC and Enron and (2) the existence of the underlying predicate fraud by Enron (i.e., that Plaintiffs actually and justifiably relied upon Enron's alleged misrepresentations in purchasing their securities). *See* discussion of law in this opinion and order at 24-26.

In response, noting that it is well established that an agreement may be informal and tacit, with proof by means of circumstantial evidence and reasonable inference,[44] Plaintiffs insist they have pleaded facts demonstrating RBC's agreement to enter into a conspiracy to defraud with Enron.  Relating to the Alberta transaction, the complaint has quoted documents, emails of RBC officials, and findings of the Bankruptcy Examiner to show that RBC knew that the transaction was structured and accounted for so as to disguise what was actually a loan to Enron as a commercial transaction and the careful crafting that went into it. The agreement to omit the usual covenants in financial transactions and Enron's guarantees are evidence of RBC's "meeting of the minds" with Enron.  RBC Vice President Frank Piazza testified that RBC approved the transaction based on an understanding that the loans would have full recourse to Enron. #26 at ¶ 67.  Similarly with LJM2, the complaint (at ¶¶ 98, 99,

---

[44] *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581-82 (Tex. 1963); *In re Performance Nutrition, Inc.,* 239 B.R. 93, 113 (Bankr. N.D. Tex. 1991).

101, 102, 80, 81, and 103) has pleaded facts demonstrating that RBC knew that LJM2 was not an independent entity although Enron and Fastow represented it as such, that there were problems with the valuation of assets, and that Enron's actual off-balance-sheet liabilities were far in excess of what Enron publicly disclosed, yet still RBC closed the deal anyway.  Plaintiffs also point to admissions by Fastow in his Plea Agreement about how LJM2 was used to falsify Enron's reported financial results.  Again, while structuring the Hawaii Trusts, RBC had concluded that the off-balance sheet liabilities were grossly misrepresented, that Enron was "pushing the edge-on tax optimization, off-balance sheet treatment of obligations, accounting practices, financial structuring etc.," as evidenced by the quotations of RBC's January 2001 RAF, but the lucrative fees and interests RBC collected were too enticing.  The structuring and use of Heracles similarly demonstrate that RBC knew or recklessly disregarded the fact that Heracles had no assets except EOG shares, which could drop below the value of RBC's loan and RBC's resulting use of guarantees by Enron.

In reply RBC maintains that, as with the statutory fraud claim, Plaintiffs fail to adequately allege the requisite element of reliance for a claim for civil conspiracy because they do not specify the alleged misrepresentations in Enron's SEC-filed financial statements nor the misinformation from the financial information services.  Instead their allegations are conclusory.

In addition RBC reiterates that Plaintiffs do not adequately plead the existence of an agreement between Enron and

RBC to defraud Enron investors.   The "snippets from an RBC internal risk analysis expressing general concerns over Enron's generally known aggressive accounting practices, and misleadingly suggesting that they were directed at RBC's participation in the Hawaii transaction" or linking "Andrew Fastow's plea agreement (which in no way references RBC) regarding his use of LJM2 to falsify Enron's financial reports to RBC's internal questioning of the structure of the LJM2 partnership at the outset of the transaction years later" is not evidence of an agreement between Enron and itself to defraud Enron investors, let alone Plaintiffs in particular, insists RBC.  #33 at 9.  *See Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 614, 617 (Tex. 1996)("For a civil conspiracy to arise, the parties must be aware of the harm or wrongful conduct at the beginning of the agreement. . . . One cannot agree, expressly or tacitly, to commit a wrong about which he has no knowledge. [citations omitted]").   At most Plaintiffs allege that "RBC intended to engage in financial transactions with Enron that Plaintiffs allege eventually resulted in injury to them."  #33 at 9.  "Such allegations fall short of demonstrating that RBC entered into a combination or agreement with Enron intending to cause Plaintiffs' injury and accordingly fail to state a claim for civil conspiracy."  *Id.* at 10, *citing Triplex Communications, Inc. v. Riley*, 900 S.W.2d 716, 719-20 (Tex. 19995)(civil conspiracy requires specific intent; parties cannot conspire to be negligent because negligence is not an intentional tort).

In their surreply (#34), Plaintiffs insist they need only allege conduct of RBC as a participant in Enron-related transactions that implies an agreement to conspire. Moreover the Court examines the complaint as a whole, not a single transaction, to see if it raised a strong inference of a meeting of the minds, an agreement to defraud investors. Plaintiffs maintain that their complaint lists evidence demonstrating that the structured finance transactions which RBC entered into with Enron were improper and implied the existence of a conspiracy between RBC and Enron to design transactions that would fraudulently misrepresent Enron's actual financial condition. *See* Plaintiffs' Response (#32 at 9-15), citing specific emails and deposition testimony from key RBC employees showing that RBC knew these transactions were improper. Plaintiffs insist they have made allegations, which the Court has summarized *supra*, from which the Court and the trier of fact can infer an agreement to conspire. They have alleged facts evidencing that Enron intended investors to rely on its financial statements, intended to manipulate those financial statements by improper accounting treatment of off-balance sheet entities and transactions, with which RBC helped with full knowledge that these transactions would have to be structured and documented specifically to achieve Enron's goals.

## Court's Determinations

**RBC's Request to Strike Reply and Motion to Strike Sur-reply**

RBC has complained in a reply (#33) that Plaintiffs have improperly raised new theories,[45] not pleaded in the complaint and requests that the reply be stricken by the Court. Nevertheless, Plaintiffs have filed a surreply (#34), to which RBC has responded with a motion to strike or alternatively a memorandum of law to address new arguments raised by Plaintiffs on sur-reply (#36), also without requesting leave of Court to do so.

Federal Rule of Civil Procedure 7 clearly states,

There shall be a complaint and an answer; a reply to a counterclaim denominated as such; and answer to a cross-claim, if the answer contains a cross-claim; a third party complaint, if a person who was not an original party is summoned under the provisions of Rule 14, and a third-party answer, if a third-party complaint is served. **No other pleading shall be allowed, except that the court may order a reply to an answer or a third-party answer.** [emphasis added by the Court]

Here there were no motions filed for leave of Court to file either a reply or surreply, nor has the Court ordered such filings.

The district judge does have discretion under Rule 7(a) to order a reply to any matters in the answer, not only to affirmative defenses, including to "new matter that warrants a response." 5 Charles Alan Wright and Arthur R. Miller*, Federal Practice & Procedure Civ. 3d* § 1185 at 28-29 (West 2004). Wright and Miller explain,

A substantial reason must be given or necessity must be demonstrated by the movant

---

[45] Plaintiffs object that they alleged in their complaint that Enron was an "issuer" of securities traded on the New York Stock Exchange. #26 at ¶¶ 31, 150. The Court observes that the complaint does cite article 581-33A, but not 581-33C, as the source of primary liability for Enron.

> to justify the court ordering a reply to an
> answer. This strict standard has proven
> difficult to satisfy inasmuch as the federal
> rules provide a number of other devices for
> uncovering the facts and narrowing the issues
> that are more effective than a court-ordered
> reply, and because allegations in the
> pleadings not requiring a response-
> -specifically, the answer--are denied
> automatically as a result of Rule 8(d).
> [footnotes omitted]

*Id.* at 31-32. Although under common law parties had to respond
to any new matter raised in an initial responsive pleading by the
other party, Federal Rule of Civil Procedure 7(a) "eliminates the
requirement of a mandatory reply to 'new matter.'" *Id.,* § 1186
at 34. Rule 8(d) provides that when no responsive pleading is
required, the allegations in a pleading are deemed denied or
avoided. *Id.; see also Beckstrom v. Coastwise Line*, 14 Alaska
190, 195, 13 F.R.D. 480, 482 (1953)("Since every answer without
a counterclaim is, in the absence of a reply, considered as denied
or avoided, Courts are understandably reluctant to grant
permission for the filing of replies."). The Magistrate Judge in
*Beckstrom*, 13 F.R.D, at 482, further noted, "Only when supported
by substantial reason will a reply be required or allowed. An
example may arise in a case where a reply may make possible a
summary judgment."

Even though both parties have indulged in improper
pleadings in their reply, surreply, and subsequent memorandum of
law, especially on a new legal issue concerning the relationship
between sections 33C and 5H, on which there is a dearth of
authority, but which would have to be resolved here, the extra
briefing has sharpened the focus on the statute and posed contrary

ways of looking at it, and aided the Court in clarifying its understanding of the TSA and resolution of the question.  Because both sides have had more than a full opportunity to respond to the other's arguments, there is no prejudice, and the Court has considered all the submissions.  Thus it denies RBC's motion to strike.

**Plaintiffs' Request for Leave to Amend**[46]

RBC objects to allowing Plaintiffs a third opportunity to replead because the deficiencies in the second amended complaint are legal, not factual, and therefore amendment would be futile.

Plaintiffs emphasize that discovery was not complete when the Second Amended Complaint was filed and was still "far from complete" when they filed their response (4/30/07).  They ask the Court to take judicial notice that since August 16, 2006, RBC has filed 5,223 documents, composed of 32,383 pages, almost 13,000 of which were not produced until February 2007.  Moreover, they claim that RBC has refused to allow depositions of seventeen

---

[46] Leave to amend is left to the sound discretion of the court and should be freely granted under Fed. R. Civ. P. 15(a), unless the court finds denial appropriate based on a plaintiff's undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by previously allowed amendments, undue prejudice to the opposing party from allowing amendment , and futility of amendment.  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *United States of America ex rel. Adrian v. Regents of the University of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004).  Delay in making an amendment is not a sufficient reason to justify denying leave to amend unless that amendment would prejudice the opposing party.  *Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993), *citing* 6 C. Wright & A Miller, *Federal Practice and Procedure* § 1488 at 659-60 (1990).  This Court finds that RBC has not shown any of the circumstances that would justify denying Plaintiffs the right to amend/supplement here.

employees whom Plaintiffs want to depose.   For these reasons, if the Court finds the pleadings are insufficient, they request leave to amend.

Because the Court finds that some pleading deficiencies may be curable and because this action was brought under state and not federal securities laws, in the interests of justice it will allow Plaintiffs to amend, but only to further delineate or to dismiss claims already raised in the Second Amended Complaint or in the briefing relating to RBC's motion to dismiss.   Since procedurally this review is under Rules 12(b)(6) and 9(b), and not under Rule 56, which allows the Court to examine external evidence, some of the issues cannot be definitively resolved at this stage.  Setting out the legal standards for each cause of action and requiring that they be met in any amended complaint appears to this Court to be a fair and appropriate way to pare down this case.   Thus the Court grants leave to Plaintiffs to amend within twenty days of entry of this opinion and order, but only if in good faith they can meet the legal requirements that this Court has set down in this opinion and in recently issued opinions addressing many of the same legal arguments raised by the parties here in a related case, brought by the same Plaintiffs as here, G-02-723, *American National Insurance Co., et al. v. Citigroup, Inc., et al.,* in reviewing Defendants Schuyler M. Tilney and Merrill Lynch's motions to dismiss and Merrill Lynch's motion for partial summary judgment, instruments #75 and 76.  *See also In re Enron Securities, Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 601-08 (S.D. Tex. 2003).   If they are unable to

adequately plead one or more of their causes of action, Plaintiffs shall file a statement indicating such. If a third amended complaint is filed, RBC shall file a timely answer and/or motion for summary judgment, if appropriate.[47]

**Causes of Action**

### Generally

First, with respect to all claims, as in G-02-723, Plaintiffs here have failed to allege with particularity the requisite facts about Enron's alleged misrepresentations and omissions (which statements, identity of speaker(s), when and where the statements were made, why the statements are fraudulent, what material facts were omitted and where, and why these omissions made the representations misleading), as well as about those of the informational services, to adequately plead a primary violation by Enron under the TSA and section 27.01, common law fraud, and the underlying fraud for the conspiracy claim. See #75 at 75-76 in G-02-723. Moreover, without that specific identifications of material misrepresentations and omissions, and the where, when, who, and why, the pleading of reliance for those causes of action requiring it cannot be adequate. If Plaintiffs are able to adequately plead the material misrepresentations and omissions under Rule 9(b), they must do the same with reliance.

---

[47] The procedural posture under Rule 12(b)(6) in this case limits what the Court can review: it may only examine the pleadings, i.e., the complaint and any documents attached to it, and documents that the defendant attaches to its motion to dismiss that are referenced in the plaintiff's complaint and are central to the plaintiff's case. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000); *Scanlan v. Texas A&M University*, 343 F.3d 533, 536 (5th Cir. 2003).

**TSA**

For the derivative aiding and abetting claim against RBC under article 581-(F)(2) of the TSA, Plaintiffs must adequately plead facts demonstrating that Enron was a "statutory seller" for purposes of primary liability under article 581-33A(2).

This Court stands by its analysis of the TSA in *In re Enron*, 258 F. Supp.2d 576, 601-08 (S.D. Tex. 2003) for primary liability under article 581-33A(2). Thus Plaintiffs must demonstrate that either Enron was in privity with Plaintiffs or plead facts that demonstrate that Lehman Brothers acted as a broker or agent of Enron in actively soliciting and selling the securities to Plaintiffs. If Plaintiffs intend to plead their agency theory, they must plead facts, and on summary judgment produce evidence, showing that there exists, or there is a genuine issue of material fact for trial about, an Enron-RBC agency relationship that satisfies Texas law requirements. *Id.;* #76 at 20-21, 34-36 in G-02-723.[48]

In G-02-723 on summary judgment, the Court concluded as a matter of law that Enron could not be primarily liable as an "issuer" under article 581-33C because article 581-5H exempts from that provision "[t]he sale of any security to any bank, trust company, building and loan association, insurance company, surety or guaranty company, savings institution, investment company and

---

[48] As pointed out in n.6 of this opinion, the evidence referenced in Plaintiffs' opposition for the alleged agency theory between issuer Enron and seller Lehman Brothers appears to be the same. #32 at n.5. The Court has held that as a matter of law the "evidence" presented by Plaintiffs in G-02-723 was insufficient to sustain the agency claim.

defined in the Investment Company Act of 1940, small business
investment company as defined in the Small Business Investment Act
of 1958, as amended, or to any registered dealer actually engaged
in buying and selling securities."   The Court notes that in G-02-
723, when the issue of exemption from the antifraud provisions of
the TSA under 33C was raised by Merrill Lynch, Plaintiffs did not
respond and did not make the arguments that they have here.   The
Court granted summary judgment to Merrill Lynch.  Here the parties
have addressed the question in their surreplies.

          After careful consideration of the sources cited by the
parties, basically the statute, law review articles, and cases
addressing rules of statutory construction, the Court is persuaded
that RBC's interpretation of the relevant provisions of the TSA
is correct.   The legislative intent of the TSA was to protect
unsophisticated investors, which helps explain the exemption of
securities purchases under section 5H by such sophisticated
investors as investment banks and insurance company from a strict
liability/primary violation claim against an issuer by secondary
market purchasers under section 33C.  The comment by the Committee
on Securities and Investment Banking to the 1963 Amendment of
section 5H states, "This amends the present exemption to include
small business investment companies, which do not need the
protection of the Act . . . ."  The Court concurs with RBC that
the presence since the 1963 amendments of the language, "whether
or not the security or transaction is exempt under Section 5 or
6," in Sections 33A and 33B, in contrast its absence in 33C,
enacted fourteen years later in 1977, indicates the legislature

intended sophisticated investors to sue under the antifraud provisions of 33A and B, and not 33C. Section 33C narrowly expanded the liability of an issuer where the issuer registered its securities for sale by someone else in a secondary market (and thus is not a "seller" under 33A) because those purchasers would not have been able to sue under section 33A. Thus the Court again concludes that Plaintiffs cannot assert an aiding and abetting claim under section 33F because section 5H does not permit them to assert a primary claim against Enron under 33C.

If Plaintiffs are able to state a primary liaiblity claim against Enron under 33A(2), regarding the claim for aiding and abetting under article 581-F(2), the Court agrees with Plaintiffs that they have adequately pleaded facts demonstrating that RBC had "general awareness" of its role as a secondary violator" and that RBC gave substantial assistance to Enron in "cooking" its books and its SEC filed reports.

### Section 27.01(d)

Again, Enron's alleged primary violation, i.e., fraudulent material misrepresentations and omissions, must be pleaded with particularity, as must actual and justifiable reliance by Plaintiffs' on them. Obviously, the material misrepresentations (and who, what, when, where and why fraudulent) or omissions must be identified before Plaintiffs can allege facts demonstrating reliance on them. In addition Plaintiffs must plead facts demonstrating actual and justifiable reliance on the false misrepresentation(s). The Court finds that the Ponzi scheme allegations adequately reflect an intent to induce Plaintiffs as

well as other investors into contracts to buy the Enron securities.

To state a claim under § 27.01(d) for aiding and abetting, Plaintiffs must, but so far fail to, plead facts that show RBC had a duty to disclose the falsity of specific misrepresentations to Plaintiffs under one of the four circumstances giving rise to such a duty under the common law. *Hoggett v. Brown*, 971 S.W.2d at 487.

Plaintiffs have alleged specific facts, arising from RBC's transactions with Enron, suggesting that RBC was actually aware of its role in aiding and abetting Enron in its deception of investors by misrepresentation of Enron's actual financial condition in financial reports, SEC filings, and the products of financial information services.

The existing case law has not clearly defined what "benefitting" from the sale of stock in which the fraud occurred means and has not restricted the "benefit" to something immediate, tangible and/or financial. Indeed there is a dearth of case law relating to the question, and what there is suggests that whether the requisite benefit exists must be determined according to the facts of the particular case before a court. Plaintiffs have asserted that RBC benefitted by gaining from Enron's misrepresentations and RBC's participation in the scheme to induce investment in Enron securities, including the sales to Plaintiffs, a significant value, whether characterized as Enron's loyalty, trust or obligation to ensure future or ongoing business with RBC.

The Court finds that such a "reward" for alleged complicity, even though intangible and prospective, is still a benefit.

### Common-Law Fraud and Conspiracy To Defraud

Plaintiffs are attempting to plead independent claims of fraud and conspiracy to defraud against RBC when they may actually have only one, conspiracy to defraud.

For "standard" common law fraud, Plaintiffs' response reveals that it believes that it was Enron that allegedly committed the fraud, i.e., made the material misrepresentations or omissions. Plaintiffs have not pleaded facts, with Rule 9(b) particularity, showing that RBC made any misstatement or omission of material fact. Instead they allege that RBC's purported participation with Enron in a number of transactions in a conspiracy to defraud that may impose derivative liability on RBC for Enron's underlying fraud, i.e., material misstatements and omissions in SEC filings and information disseminated to the market. If Plaintiffs do succeed in adequately pleading with particularity the underlying "standard" common law fraud by Enron, the Court finds that they have otherwise stated a conspiracy claim against RBC. The Court agrees with Plaintiffs that they have alleged facts and circumstances implying a meeting of the minds in a conspiracy to deceive the market about Enron's actual financial condition and concerted action to accomplish that end.

As for fraud based on nondisclosure, Plaintiffs must plead facts demonstrating that RBC had a duty to disclose Enron's misrepresentations and omissions. *Hoggett*, 971 S.W.2d at 487.

Accordingly, for the reasons stated above, the Court

ORDERS that the holder claims based on Farm Family Casualty Insurance Company and Farm Family Life Insurance's purchases of Enron Capital, L.L.C. preferred shares in 1993, Farm Family Life Insurance Company purchase of an Enron bond in 1992, and National Western Life Insurance Company's purchase of Enron bonds in 1992 and 1993, are DISMISSED with prejudice.   In addition, the Court

ORDERS that RBC's motion strike Plaintiffs' surreply (#36) is DENIED.

The Court further

ORDERS that RBC's motion to dismiss (#30) is DENIED and Plaintiffs' request for leave to amend is GRANTED.   Plaintiffs shall file an amended complaint within twenty days of entry of this order that cures the deficiencies in each cause of action, as pointed out by the Court in this opinion, or shall inform the Court that they are unable to do so.   RBC shall file a timely response or motion to dismiss or for summary judgment, whichever RBC determines is appropriate.

**SIGNED** at Houston, Texas, this 24th day of August, 2007.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE